[L. A. No. 16779.   In Bank.—June 22, 1939.]

ERWIN P. WERNER, Petitioner, v. THE STATE BAR OF CALIFORNIA, Respondent.

Erwin P. Werner, *in pro. per.,* for Petitioner.

Philbrick McCoy for Respondent.

CURTIS, J.—By a notice to show cause and a subsequent supplemental notice, each issued by local administrative committee No. 4 for the county of Los Angeles, petitioner herein, Erwin P. Werner, an attorney at law, was directed to appear before said committee to show cause why he should not be disciplined for alleged professional misconduct upon five separate and distinct charges set forth in said notices. Four of these charges were based upon the alleged misconduct of petitioner in soliciting professional employment through the instrumentality of one Nathan Balkin, an unlicensed person, in violation of rule 2 of the Rules of Professional Conduct. The fifth charge involved the conduct of petitioner in the settlement of a claim for personal injuries in favor of one Manuel Martin. This charge was dismissed by the Board of Bar Governors after the committee had found that there was no legal evidence to sustain the same. The action of the board in dismissing said charge is not called into question by this proceeding, so no further reference will be made to it.

The remaining four charges arose out of the alleged misconduct of the petitioner in soliciting employment as an attorney through the efforts of said Nathan Balkin in four personal injury matters, referred to in the record as the "Stirdivant-Lash Matter", the "O'Shaunnessy Matter", the "Lieb Matter" and the "Luciano Matter". These four charges were consolidated and all heard together by the committee. At the conclusion of the hearing the committee made and filed its findings of fact and conclusions in favor of petitioner. The committee found in each of said matters that Nathan Balkin did solicit each of said injured parties to employ petitioner as an attorney for the purpose of recovering damages for the personal injuries sustained respectively by each of said persons. It further found in the Stirdivant-Lash Matter that, "At said time the said Balkin solicited the said Anna Stirdivant to employ Erwin P. Werner as her attorney for said purpose and on the following day, at or about the hour of 9 o'clock in the morning, as a result of a phone call by Benjamin Stirdivant at the

solicitation of said Balkin said Edwin P. Werner called upon the said Anna Stirdivant, who was theretofore unknown to him, and discussed with her employment as her attorney in connection with said accident; that he did not solicit said employment as attorney. It is not true that at or about the time of said solicitation of employment on behalf of Erwin P. Werner by said Balkin that Erwin P. Werner agreed to compensate the said Balkin for his services in the event he was successful in securing the employment of said Erwin P. Werner, and it is not true that on or about December 26, 1934, said Erwin P. Werner had been fully advised by said Balkin of the contents of the police record of the accident which had resulted in the injuries to the said Anna Stirdivant; that said Anna Stirdivant declined to employ Erwin P. Werner as her attorney.''

In each of the three other matters the committee found that, ''At the time herein mentioned said Erwin P. Werner knew the said Nathan Balkin but did not know that he was soliciting professional employment for him in cases involving personal injuries.'' The conclusion of the committee based upon said findings was, ''That respondent has not been guilty of a violation of his oath and duties as an attorney and counselor at law within the meaning of subdivision 2 of Section 287 of the Code of Civil Procedure.'' By reason of the foregoing findings and conclusion, the committee recommended that the charge against petitioner be dismissed, the committee stating that, ''While this case, in the opinion of the committee, presented some very suspicious circumstances in support of the charges made, we do not feel that there is sufficient legal evidence upon which to sustain the charges.''

The administrative committee forwarded to the board of governors of The State Bar its report of said proceeding together with its findings of fact, conclusions, and recommendation. Upon receipt of said report and accompanying documents, the board of governors, upon the record before the committee, and without taking any further testimony, made its findings of fact and conclusions with respect to these four charges, and recommended that petitioner be suspended from the practice of law for the period of six months. It was to review this recommendation of the board of governors that this proceeding was instituted.

The findings of the board of governors differed from those of the committee in one respect only. While the committee inferentially in the Stirdivant-Lash matter, and expressly in the three other matters, found that petitioner did not know that Nathan Balkin was soliciting professional employment for him in cases involving personal injuries, the board of governors found to the contrary, that is, that petitioner knew that Nathan Balkin "was soliciting professional employment for him in cases involving personal injuries".

Practically the sole contention of petitioner is that the evidence is insufficient to support the findings of the board of governors that petitioner knew that Nathan Balkin was soliciting employment for petitioner in cases involving personal injuries.

We shall now proceed to a discussion of the evidence produced before the local administrative committee in support of these four charges.

### The Stirdivant-Lash Matter.

Anna Stirdivant and her daughter, Mabel E. Lash, were injured in an automobile accident on the night of December 24, 1934. A couple of days later one Nathan Balkin called upon each of these parties at the residence of Mrs. Stirdivant and solicited them to employ the petitioner as their attorney for the purpose of instituting actions to recover damages for their injuries sustained in said automobile accident. Balkin was not an attorney, but purported to represent petitioner. He told Mrs. Stirdivant and Mrs. Lash, and Benjamin Stirdivant, the son of Mrs. Stirdivant, that he had information that they were injured in an automobile accident and that he would like to have them take Mr. Werner as their attorney. He had with him what purported to be a record of said accident from the police department of the city. He informed them that Mr. Werner had been city attorney of Los Angeles. He urged Mrs. Stirdivant to write a letter to petitioner asking petitioner to call upon her in reference to her case and telling him that a friend of hers had recommended petitioner. At the same time, Balkin requested Benjamin Stirdivant to go with him to a drug store and phone petitioner. At the instance of Balkin, the letter was written by Mrs. Stirdivant and mailed that afternoon by her son, Benjamin. The latter also accompanied Balkin to a nearby drug store and after Balkin had dialed a certain number, which he said was petitioner's telephone

number, Benjamin Stirdivant took the telephone receiver at Balkin's direction and asked that petitioner come out to his mother's house, giving the name and address of his mother. Balkin then left in his machine, and the next day petitioner called at the Stirdivant home and interviewed both Mrs. Stirdivant and her daughter, Mrs. Lash. The latter declined to have anything to do with petitioner, but her mother went to petitioner's office the next day for the purpose of further consultation regarding the latter's employment. Petitioner in the meantime had prepared an agreement in writing setting forth the terms of his employment as Mrs. Stirdivant's attorney in case he should be employed in the proposed action. This agreement also fixed petitioner's compensation should Mrs. Stirdivant decide to employ him. Mrs. Stirdivant declined to sign the papers at the time, and said she wanted to take them home to have her husband read them. She left with the "papers" and that was the last petitioner saw of her. She did not employ him. Balkin was produced at the hearing before the local administrative committee and made a most unsatisfactory witness. His replies were usually, "I don't remember" or, "I refuse to answer on the ground that my answer might incriminate or degrade me." He did deny that petitioner had ever paid him anything to solicit professional employment in cases involving personal injury. Petitioner also denied that he had ever employed Balkin to solicit either Mrs. Stirdivant or Mrs. Lash, or any other person to employ him in personal injury actions. He said that he called at the Stirdivant home in response either to the telephone call or to a letter from Mrs. Stirdivant, and that he had no knowledge or information that Balkin had inspired either the telephone call or the letter.

O'Shaunnessy Matter.

On or about February 13, 1935, Helen O'Shaunnessy was injured in an automobile accident in the city of Los Angeles. On the next day, Nathan Balkin called upon her and solicited her to employ petitioner to represent her in an action to recover damages for injuries sustained as a result of said accident. He presented her with the professional card of petitioner and proceeded with her in much the same manner as he had with Mrs. Stirdivant. He had no success on the first visit and returned a few days later. On this occasion the

name of a former member of the Board of Bar Governors was mentioned by a brother of Miss O'Shaunnessy, whereupon Balkin became greatly excited and frightened and left the house at once. Petitioner never called on Mrs. O'Shaunnessy or had any communication with her, and the matter ended with the exit of Balkin from the O'Shaunnessy home. Petitioner made the same denials respecting the activities of Balkin in this matter as he had made in the Stirdivant-Lash matter. He further denied that he ever gave Balkin any of his (petitioner's) cards.

### The Lieb Matter.

George Lieb was injured in an automobile accident on March 8, 1935, in the city of Los Angeles. On the next day Nathan Balkin called on Tom Lieb, the son of George Lieb, presented petitioner's professional card, and solicited Tom Lieb to employ petitioner on behalf of his father for the purpose of recovering damages for injuries sustained in said automobile accident, and as in the preceding matters, extolled petitioner's ability as a lawyer, and urged him to telephone petitioner and state that a friend had told him to call up petitioner. Nothing seems to have resulted from the efforts of Balkin, as petitioner was never approached by any member of the Lieb family, nor did he take any action on Lieb's behalf in the prosecution of any action brought by Lieb, if in fact the latter ever brought any action. Petitioner testified that he never asked Balkin to solicit any case from Lieb, or from any other person, and that he never gave Balkin any of his professional cards.

### The Luciano Matter.

William Luciano was injured in an automobile accident on or about August 13, 1935. On the next day, Nathan Balkin called at the Luciano home, and there met the mother and two sisters of William Luciano. He solicited them to have William Luciano employ petitioner as his attorney in an action to recover damages sustained by reason of his injuries. He presented them with petitioner's card and followed much the same tactics employed by him in soliciting employment for petitioner by Mrs. Stirdivant and the others mentioned above. Balkin on being informed by the sisters that they would not move in the matter until they had consulted their brother, left the Luciano home and was not seen by any of the inmates until a few days later. About two days after Balkin's visit, one

of the sisters of William Luciano called up petitioner on the phone and stated that she wanted to make an appointment with him, and also that she wanted to ''see the little stout man with glasses who gave me your phone number to call you''. Petitioner replied, ''I don't know who you are talking about. I haven't anybody working for me.'' This ended the conversation. Two days later, Balkin called again and had a conversation with Annabelle Luciano, one of William Luciano's sisters, who relates their interview as follows: ''He said, 'Did you call up Mr. Werner?' and I said, 'Yes,' and he said, 'Do you know, he is very mad. I almost lost my job.' and I said, 'I am sorry but I wanted you to come back again so my brother could speak with you about the case. He didn't have an attorney at that time and we thought we should get your attorney you spoke about.' And so he said, 'Of course, he would not know me,' He said, 'You must not do that,' and he got sore at me and he said, 'Don't do it any more.' and I said I would not do it any more. 'You don't want me to lose my job?' and I said, 'Of course not.' Thereupon Balkin left the house.'' Petitioner denied that he ever had any conversation with Balkin about the Luciano case, or that he ever told Balkin that he ''was mad'' about anything connected with the case. He made no denial of having the telephone conversation with Annabelle Luciano.

Balkin pleaded guilty to a complaint filed in the municipal court of the city of Los Angeles charging him with soliciting professional employment in the four matters heretofore set forth, but the name of the attorney in whose behalf he was charged with soliciting employment was not alleged in the complaint filed against him. He admitted that he was engaged in that business for a number of years in Chicago, where it was not in violation of the law, before coming to this state, and he further stated that he knew no other business and had engaged in it since coming to this state. He had some legal business with an attorney who had his office in the same suite of rooms in which petitioner had his office. The evidence does not show that he had any legal business with petitioner. The evidence is in some conflict as to the frequency he was seen in the common reception rooms of such suite of offices. There is evidence that he was seen in Mr. Werner's office on a few occasions, but not often. Petitioner admitted that he knew Balkin and saw him at times in the reception room of his of-

fice and on a very few times in his own office. On one of such occasions Balkin was selling neckties.

In reviewing the evidence, findings and conclusions of the Board of Bar Governors, it is the duty of this court to re-examine the entire proceedings before said board as they are required to be kept, and transmitted to this court. (*In re Shattuck*, 208 Cal. 6 [279 Pac. 998].) "This court is not bound by the findings or recommendations made by the local administrative committee, nor their adoption by the Board of Bar Governors, and will examine the record anew to ascertain whether or not any charge has been proven against petitioner which merits disbarment." (*In re Stafford*, 208 Cal. 738 [284 Pac. 670].) "The only order or orders which are provided for therein (The State Bar Act) and which have or were intended to have the effect of working the disbarment, suspension or discipline of any person who might be subjected to the powers and processes with which the Board of Bar Governors are vested are the final orders which are to be made by this court under the provisions of said act." (*In re Shattuck*, 208 Cal. 6, 12 [279 Pac. 998, 1000].)

It follows from the foregoing and prior decisions of this court as well as from the provisions of the State Bar Act that it is the duty of this court to pass upon the evidence, weigh its effect, and finally determine whether it is sufficient to sustain the charges against the accused attorney.

The evidence shows without any question that the witness, Balkin, did solicit on the various occasions set forth in the four charges against petitioner the employment of petitioner as attorney for the purpose of instituting actions to recover damages for the several injuries sustained respectively by the injured persons. The only question in serious dispute is whether Balkin in soliciting said employment did so with the knowledge and consent of petitioner. As to petitioner's knowledge of Balkin's activity in petitioner's behalf, the local administrative committee found in favor of petitioner, while the Board of Bar Governors upon the same and identical evidence found against petitioner.

It is apparent that there is no direct evidence that Balkin in soliciting employment for the petitioner was acting for petitioner with either his knowledge or consent. The evidence that petitioner knew of Balkin's activity in his behalf is entirely circumstantial. In the Lieb matter there is not even

any circumstantial evidence which tended to show that petitioner knew that Balkin was soliciting employment for him. A reading of the evidence shows simply that Balkin called upon relatives of the injured party and asked them to employ petitioner and gave to them petitioner's card. None of these parties ever saw petitioner or had any conversation with him over the telephone or otherwise. The only place in the evidence respecting the charge where petitioner's name appears is in the conversation between Balkin and the injured party's relatives which was had not in the presence of the petitioner, and there is absolutely no evidence showing that petitioner in any way authorized the use of his name by Balkin, or had any knowledge that Balkin was making use of petitioner's name in the solicitation of his employment by the relatives of the injured person.

In the Luciano matter the evidence against petitioner is slightly, if any, stronger against petitioner than that in support of the Lieb charge. After Balkin had called upon the relatives of Luciano, given them petitioner's card, and asked them to communicate with petitioner, a sister of William Luciano some two days later called petitioner on the telephone, and after stating to him that she wanted to make an appointment with him, said she wanted to see "a little stout man", evidently describing Balkin. Petitioner replied, "I don't know who you are talking about." Miss Luciano then said, "He gave me your phone number to call you." To this remark respondent replied, "I haven't anybody working for me." Miss Luciano replied, "Okay, thanks", and put down the telephone. There was surely nothing in this incident which would tend to connect petitioner with the activities of Balkin. The latter a few days later called at the Luciano home and asked Miss Luciano if she had called up Mr. Werner, and she replied that she had. In the absence of any evidence connecting petitioner with the acts of Balkin what transpired at this second visit, and whatever conversation was had between Balkin and Miss Luciano was not legal evidence against petitioner.

In the O'Shaunnessy matter, the evidence against petitioner lacks any evidentiary support whatever. It shows that Balkin called upon Miss O'Shaunnessy, and as on the other occasions he solicited her to employ petitioner, giving her petitioner's card and asking her to write or telephone petitioner. She did

neither. Balkin called at a later date, but as hereinbefore stated, he became frightened at the mention of a certain attorney's name and left hurriedly and never returned. There is not a scintilla of evidence in the entire record which even tended to show that petitioner knew of either of these visits of Balkin to the O'Shaunnessy home, or that he had any connection with or knowledge of Balkin's efforts to secure his employment by Miss O'Shaunnessy.

In the Stirdivant-Lash matter, petitioner did, upon receiving a telephone message from Benjamin Stirdivant, call upon Mrs. Stirdivant and Mrs. Lash and confer with Mrs. Stirdivant respecting his employment as her attorney to recover damages sustained by her in the automobile accident. He further met her at his office by appointment, and he presented to her a proposed contract which he had drafted defining the terms of his employment and fixing his compensation. Mrs. Stirdivant did not sign the contract, but took it with her, and petitioner never heard from her in regard to her case again. It is true that the telephone message sent to petitioner by Benjamin Stirdivant was prompted by Balkin, but there was nothing in the message that indicated to petitioner that Balkin had inspired it. Nor is there any evidence to indicate that petitioner had any knowledge that Balkin had visited the Stirdivant home.

Balkin was called as a witness upon this charge as in the other three. As stated before he proved a most unsatisfactory witness. He did, however, deny that petitioner had ever employed him to solicit business for him or had ever paid him for any work of that character. Petitioner himself took the witness stand and denied that he had ever employed Balkin to solicit business for him and denied that he had any knowledge that Balkin was engaged in soliciting business for him. Taking the evidence against petitioner upon this as well as the other charges, we are not impressed with its evidentiary value. While the proof is clear that Balkin was soliciting business for petitioner, it may well be asked why was he doing so if he was "to get nothing" out of the business after it was received? We must admit that this evidence raises a strong suspicion that Balkin was acting for petitioner and with the knowledge of the latter. If we were to concede that this evidence justified an inference at least in the Stirdivant matter that respondent had knowledge of Balkin's activities, this in-

ference would be sufficient to sustain the truth of the charge against petitioner involving the Stirdivant matter. ■ However, this inference is contrary to the testimony of petitioner that he had no such knowledge. If petitioner's testi-· mony is true. then we would be justified in holding that he was not guilty of the charges, or of any of them, preferred against him. To pass upon the weight to be given the testimony of any witness when only the written record is before a reviewing body is always a most difficult undertaking. In this connection we think it proper to refer to the findings of the local administrative committee, not that its findings are binding upon us but simply to aid the court in determining the weight of the evidence upon which we are called to act. This committee was composed of three reputable and experienced members of the Los Angeles Bar. The members of that committee gave a great deal of time and unusual care in hearing the charges against petitioner. A record of more than nine hundred pages of testimony is before us as having been introduced at the hearing. The rulings of the committee upon the admission of evidence and upon other questions raised at the hearing are quite numerous. They all appear to be fair and just. No complaint is made by either party as to any ruling or other action taken by the committee except as to its final action. This committee personally contacted the witnesses at the hearing. They observed their conduct and demeanor while testifying, and the character of their testimony, and no doubt took into consideration the interest of the petitioner in the result of said hearing. As they found in favor of the petitioner, they evidently believed he was telling the truth when he disclaimed any connection with Balkin's activities. The members of the committee were in far better position ·to pass upon the truthfulness of petitioner's testimony than were either the members of the Board of Bar Governors, or are the members of this court. In *Mauer* v. *State Bar,* 219 Cal. 271, 276 [26 Pac. (2d) 14], this court stated its views in that respect as follows: ''However, bearing in mind that the local administrative committee, number eight, which heard the witnesses and was in a better position to judge the certainty of the offense than we are, or the Board of Governors before whom he failed to appear, recommended suspension of eighteen months, and that the second administrative committee, in like favorable position, recommended a reprimand only,

it would seem that suspension for a period of three years should convince petitioner and any other person with similar inclinations that such transactions will not be tolerated in the profession,'' In *Egan* v. *State Bar,* 10 Cal. (2d) 458, 462 [75 Pac. (2d) 67], we find a similar expression in the following language, ''The recommendation of the local committee, which was in closer touch with the personal attributes of petitioner and the background of the case on the hearing than are we on the record, has caused us to hesitate to award the extreme penalty provided by law.''

The finding, therefore, of the local administrative committee as to the truth of the charges against the petitioner having been founded upon this personal contact with petitioner and the other witnesses in the case, is entitled to our respectful consideration, and causes us to hesitate from a mere reading of the printed record before us to arrive at a conclusion contrary to that of the committee. Accordingly it is our conclusion that none of the four charges against petitioner as alleged in the original and supplemental notices to show cause, and hereinbefore discussed in detail, is sustained by the evidence. It is therefore ordered that this proceeding against petitioner be and the same is hereby dismissed.

Edmonds, J., Shenk, J., Langdon, J., Houser, J., and Seawell, J., concurred.