[L.A. No. 30134. In Bank. May 16, 1974.]

MILTON M. YOUNGER, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Hitt, Murray & Caffray, Donald B. Caffray and Richard E. Conway for Petitioner.

Herbert M. Rosenthal and Stuart A. Forsyth for Respondent.

Sims & Solomon, Gabriel W. Solomon, Thomas R. Davis, Arthur F. Fisher, Kenneth N. Hastin, Anthony J. Klein, Eugene W. McKnight, Jere N. Sullivan and William M. Sims as Amici Curiae.

OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar of California that petitioner be suspended from the practice of law in this state for a period of nine months. Petitioner was admitted to practice law in California in 1957, and he has no prior record of discipline.

In a notice to show cause, petitioner was charged with soliciting professional employment, personally or through cappers and runners, in six separate matters. The local administrative committee found, among other things, that the allegations contained in counts 5,[1] 8, 12,[2] and 13[3] were true, but that the allegations contained in the remaining counts (including counts 9, 11, and 14) were untrue. The local administrative committee then recommended that petitioner be suspended from the practice of law for a period of six months.

The disciplinary board adopted the findings of the local administrative committee with respect to counts 5, 8, 12, and 13 (amending them in certain particulars) and, in addition, found that in those counts, as well as counts 9, 11, and 14, "there was a common plan, scheme, modus operandi

---

[1] With the exception of the allegation that the person allegedly solicited was a stranger to petitioner.

[2] With certain minor exceptions.

[3] Counts 12 and 13 relate to the same prospective clients. Count 12 charged solicitation on behalf of petitioner by a capper and runner, with petitioner's knowledge and approval, while count 13 charged personal solicitation by petitioner.

for [petitioner's] cappers to solicit clients for [petitioner]." The board dismissed the remaining counts against petitioner and recommended that he be suspended for nine months.

*Counts With Respect to Which Allegations Were*
*Found to Be True (Counts 5, 8, 12, and 13)*

Count 5 relates to an alleged solicitation of Mrs. Evelyn Jenkins (hereinafter "Evelyn") by a capper for petitioner, with the latter's knowledge and approval. Evelyn had been seriously injured in an automobile accident on February 19, 1971. The next day, while she was recuperating in the hospital, a man by the name of Robert Conners came to her room. He told her that he had been a witness to the accident and that petitioner had satisfactorily handled legal matters for him some time in the past. Evelyn's parents and her husband's sister were in the hospital room at the time Mr. Conners stopped by.

Evelyn testified, in part: "He [Conners] said, 'I'm Mr. Bob ——' I didn't get the name. Like I said I was in no condition even to talk to anybody about anything.' He says, 'I was approached this morning by two insurance agents that wanted me to sign some sort of fraud documents.' He said, 'I'm your witness to your accident,' and he went on, and he said, 'You're going to need a very good attorney to help you out,' and I said, 'Well, what do you mean?' He said, 'Well, I was in the same predicament you were.' He said when. I don't know, two or three years. He said he had been in the same predicament I was and if it wasn't for his good attorney he would have gotten himself in a bind, so he said, 'My attorney is [petitioner]. I would like for you to talk to him.' . . . He said, 'He's at his office.' "

Evelyn's mother-in-law testified, in part: "He [Conners] said he witnessed the accident, and he wanted to help her [Evelyn], and she would need a good lawyer, and he knew one, [petitioner], he [petitioner] had done a lot for him in an accident he had where he lost an eye or nearly lost an eye, I don't know which he said, but he said he [petitioner] was a good lawyer, attorney, and he would help her, and the insurance companies wouldn't do a thing for you without an attorney and she needed one."

Conners then, without any suggestion from Evelyn that he do so, dialed petitioner's office on the telephone next to Evelyn's bed and turned the telephone over to her. Evelyn's mother-in-law testified that Conners told Evelyn it would be better for her to talk with petitioner, as otherwise it might appear that he (Conners) was a "hustler," and that when Evelyn indicated she did not know what to say, Conners told her that she should

just tell petitioner she had been in a wreck and petitioner would "take it from there."

Evelyn then had a telephone conversation with petitioner, in which she briefly described the accident and told petitioner her room number at the hospital. Conners left as soon as Evelyn hung up, saying, according to Evelyn's mother-in-law, that it would not look right for him to be there when petitioner arrived.

Petitioner testified that he had not authorized Conners, or any other person, to solicit Evelyn. However, within five minutes after Evelyn hung up the telephone and Conners left, petitioner came to the hospital room, bringing with him various legal forms. In the ensuing conversation between petitioner and Evelyn, there was some discussion of the stranger (Conners) who had just been there.[4]

Although Evelyn was apparently unable to describe the accident to petitioner, she did describe her injuries. She also, at petitioner's request, executed four authorizations to release medical records and a request for a police report. She said that petitioner explained that the documents would enable him to obtain a full report from her doctor on her condition and a report from the police indicating how the accident happened.

Petitioner said that he would investigate the accident for Evelyn and that it would not cost her anything. To her mother-in-law, he said, "I get mine from 10 percent," but he did not make such a statement to Evelyn. At the time petitioner was in Evelyn's room, her left eye was swollen shut and bandaged, and she could see very little with her right eye. As a result, she was unable to read. Petitioner nevertheless, without discussing the possibility of his representing her as an attorney, gave her his *blank* retainer agreement, which she executed. Under the agreement, petitioner was to receive a fee of 33⅓ percent of any amount recovered in Evelyn's behalf.

Evelyn claims that it was not until a week or two later, after her release from the hospital, that she learned she had retained petitioner. At that time, she was told by the husband of the driver of the vehicle in which she had been injured, that petitioner was purporting to represent her. She at one time had been represented in a divorce matter by a member of petitioner's law firm and had on occasion seen petitioner in the office. Peti-

---

[4]According to the testimony of Evelyn and her mother-in-law, petitioner indicated that Bob drove a PG&E truck and that he knew him but could not at that time recall his last name, although he had it in a file in his office.

tioner, in fact, had actually once made a brief appearance in court on her behalf. She said, however, that if she had desired to retain an attorney at the time petitioner saw her in the hospital, she would have retained another attorney, Mr. Gabriel Solomon, who had previously represented her. Later, at the request of Mr. Solomon, who discussed the matter directly with petitioner, the latter cancelled the retainer agreement executed by Evelyn and ceased representing her.

In count 8, petitioner was charged with the alleged solicitation of Mrs. Ruth Stancil by a capper on his behalf and with his knowledge and approval. Mrs. Stancil and her son had been injured on July 31, 1968, in an automobile accident; and at the time of the alleged solicitation Mrs. Stancil was hospitalized because of her injuries. Mrs. Karen Christensen, who was also hospitalized at that time, was in the same hospital room as Mrs. Stancil. Both of them testified that Leonard Winters, petitioner's private investigator, came to the room unannounced on August 3, 1968, on four occasions.[5]

On Winters' first visit, he told Mrs. Stancil that he wanted to help her because he was acquainted with her husband. He also told her that he represented petitioner, and he gave her a business card. He further offered to bring her anything she might need (such as a robe or a magazine).

When Winters returned later on, he again informed Mrs. Stancil that he represented petitioner's law firm. He also told her that he had investigated the other party involved in the accident and learned that such party was well off financially. Winters further mentioned that he knew of a person who had witnessed the accident and said that if Mrs. Stancil retained petitioner's firm, she would receive very soon a large sum of money for herself and her son and could have a new car. Mrs. Stancil then informed Winters that she already had a family attorney (Mr. Gabriel Solomon). Winters thereupon said that petitioner was a better attorney, and he urged Mrs. Stancil to see him. She finally agreed to do so.

Mrs. Christensen testified, in part: "She [Mrs. Stancil] was hurting, she was in a lot of pain, and I think she got to the point where she was tired of hassling with him [Winters]. I guess she more or less said, 'Okay,' or

---

[5] A woman visiting Mrs. Stancil at the time the solicitation was made testified by deposition that she knew Winters and that he was not the man who came to Mrs. Stancil's room. The members of the local administrative committee and the disciplinary board, however, apparently believed Mrs. Stancil and Mrs. Christensen.

Winters had been employed by petitioner's firm since 1950 as its investigator. In 1971, he earned approximately $17,000 in that capacity.

something and then he came back with [petitioner] that night . . . . Yes, she was to the point where she just said anything to get him [Winters] out of the room." In addition, Mrs. Christensen testified: "[Mrs. Stancil] was crying. She was very upset and [Winters] just kept pursuing the whole issue, and so I looked over at him and said, 'For God's sakes why don't you get out and leave her alone.' "

That evening, Winters returned to the hospital room again, this time accompanied by petitioner. He represented to Mrs. Stancil that he knew of another person who had witnessed the accident and said that she should employ petitioner, as petitioner's firm could obtain a new car for her and a large sum of money for her and her son and could help her more than anyone else.

Mrs. Stancil testified: "[Petitioner] said that he would guarantee me $20,000 and a brand new car . . . and he said . . . that I wouldn't have to work another day in my life. . . . [H]e just said that if any attorney could get me the most money . . . he could get me the most money . . . ." She also testified that petitioner had with him some papers, which he asked her to sign, but that she refused, explaining that she had her own attorney, Mr. Gabriel Solomon. She said that petitioner then turned to Winters and was "very nasty," saying, "I thought you had it all fixed." Mrs. Christensen testified in this respect, as follows: "[Petitioner] turned around to Mr. Winters and said, 'I thought you had this all sewed up,' or something to that effect. 'I thought she was ready to sign the papers,' or something, and she said no, she wasn't going to sign anything, she wanted to see her own attorney. He got very irritated, and that was it." After this conversation, petitioner and Winters left together.

Mrs. Stancil said that thereafter Winters returned still another time and again urged her to emply petitioner's firm.

In October 1968, Gabriel Solomon wrote to petitioner accusing him of having solicited Mrs. Stancil and of having made disparaging remarks to her about his ability to handle her lawsuit. Later, Mr. Solomon and petitioner had a meeting, at which petitioner denied the latter accusation but did not deny the former.

Both petitioner and Winters unequivocally denied that they were ever in Mrs. Stancil's hospital room.

Count 12 relates to the alleged solicitation, as prospective clients, of the family of Joseph Jukich (hereinafter "Joseph") by a capper of peti-

tioner. Joseph, an adult, had suffered severe physical and mental injuries as a result of an automobile accident on July 22, 1969. Count 13 relates to an alleged personal solicitation by petitioner with respect to Joseph's family.

The accident which caused Joseph's injuries occurred when a sheet of plywood blew off a truck traveling in front of him, crashed through the windshield of his car, and struck him in the head. His parents, who resided in the Red Bluff area, arrived in Bakersfield the following day. His sister, Mrs. Kathy Everett, and her husband, residents of Oregon, came a day later.

The manager of the hotel at which the parents were staying recommended that they employ Mr. Arthur Fisher to represent them. They saw Mr. Fisher on the night of July 23, 1969, and executed a retainer agreement with him the next day.

Joseph's sister went to the hospital as soon as she arrived in Bakersfield on July 24, 1969, and then went to the home of her mother-in-law, where she planned to stay during her visit. She testified that later on the day of her arrival she received a telephone call from either petitioner or his investigator, Leonard Winters. Although at the time of the hearing, she could not recall which of the two had made the call, she testified: ". . . I can't remember whether it was [petitioner] I talked to on the phone and talked to him later in the office or Mr. Winters, but when I got to the office it was the same voice, but I can't remember now which one it was." Petitioner and Winters both denied making any such telephone call.

The sister testified that the person who called her asked if an attorney had been retained and that she informed him that she thought her parents had employed an attorney. The caller nevertheless suggested that she bring her parents to petitioner's office, giving her the name of petitioner's law firm and the address. Thereafter, the sister had a discussion with her parents, and it was agreed that they would all go to petitioner's office the next day.

The visit took place as scheduled. One of petitioner's partners was there, and subsequently petitioner, as well as Winters, appeared. Petitioner, according to the testimony of Joseph's mother, sister, and brother-in-law, repeatedly urged the family to retain him. Joseph's mother testified that he told them that "he and his partners had several of these accident cases, and that they had won them all, and that they were extremely good at

those cases." He further stated that he could do more for them than the other attorney could.

The parents had already been informed that it would be necessary that a guardian or guardians be appointed for Joseph, and it was their intention to ask that they be appointed. Petitioner, however, suggested that the parents agree to have Joseph's sister appointed instead, so that the retainer agreement they had signed with Mr. Fisher would not be effective, and a new retainer agreement could be executed with him. This suggestion offended the parents.

Petitioner asked Joseph's sister to go to another room with him, and she and her husband then had a private conversation with petitioner, in which the latter further urged that the sister be appointed guardian, so that she could "sign it over to us and the other will be void." After the sister and her husband left, petitioner went out into the hall and made further arguments in this respect, speaking with the sister alone for about 10 minutes. The decision made, however, was to continue having Mr. Fisher as the attorney in the case.

Petitioner admitted that he had urged that the sister be appointed guardian so that she could retain him as the attorney, and stated: "I probably was vigorous in suggesting that. These people—it was a good case. . . . I am sure I would have done my best to encourage them to retain our firm."

*Additional Counts Considered by Disciplinary Board in Finding a Common Plan, Scheme, and Modus Operandi for Cappers of Petitioner to Solicit Clients for Him (Counts 9, 11, and 14)*

Since the allegations of these counts were not found to be true, they will be summarized only briefly.

Count 9 relates to an alleged solicitation of Wilmer McMullen, who, within a day after he was injured on March 6, 1968, in an automobile accident, was allegedly solicited, as he was convalescing in a hospital, by John Harrison, a retired Bakersfield police officer and former client of petitioner's. There was evidence that Harrison had told McMullen, among other things, that "he [Harrison] was with [petitioner's firm] and that he would be glad to have them represent [McMullen] if [McMullen] needed them" and later telephoned the McMullen home twice to ask what they had decided to do. Petitioner testified that he had not authorized Harrison to solicit McMullen, and Harrison testified that he contacted McMullen because he was attempting to become a private investigator.

Count 11 relates to an alleged solicitation of the family of Mr. Bobbie Turner on behalf of petitioner by Mr. Conners. Mr. Turner was accidentally electrocuted on November 15, 1968, and the solicitation allegedly took place the afternoon of the day of the accident. There was evidence that Mr. Conners had unexpectedly appeared at the home of Mr. Turner's parents, informing the father that he had taken photographs of the scene of the accident and that he represented and recommended petitioner's law firm, and that he had given the father petitioner's business card, on the back of which Conners had written his own name and address.

In count 14, it is alleged that one of petitioner's cappers had solicited John Wheat and his wife to retain petitioner as an attorney with respect to a claim for injuries received in an industrial accident. There was evidence that on the afternoon of the day of the accident Mr. Harrison unexpectedly appeared at the Wheats' home, 10 miles outside of Bakersfield; that he told Mrs. Wheat he was a private investigator and recommended petitioner as an attorney, giving her petitioner's business card; that Harrison telephoned petitioner and made an appointment for Mrs. Wheat to see petitioner the next day; that Mrs. Wheat saw petitioner and told him "that Mr. Harrison had sent [her] to him"; that that evening petitioner visited Mr. Wheat while the latter was convalescing in his hospital room and was under heavy sedation following amputation of his leg; that petitioner had Mr. Wheat sign an application for workmen's compensation benefits; but that thereafter Mr. Wheat informed petitioner that he was going to retain another attorney, and petitioner left.

### Petitioner's Contentions

Petitioner's principal contentions are that the evidence is insufficient to show that he has been guilty of solicitation of professional employment, in violation of rules 2 and 3 of the Rules of Professional Conduct; that the disciplinary board's independent finding that there was a common plan, scheme, and modus operandi of solicitation by cappers for petitioner in counts 5, 8, 9, 11, 12, 13, and 14 was improper and erroneous; and that, in any event, the recommended discipline is too severe.

As pointed out by this court on innumerable occasions (see, e.g., *Walter* v. *State Bar,* 2 Cal.3d 880, 887(2) [87 Cal.Rptr. 833, 471 P.2d 481]; *Simmons* v. *State Bar,* 2 Cal.3d 719, 728-729(3) [87 Cal.Rptr. 368, 470 P.2d 352]), the burden is on petitioner to show that the disciplinary board's findings are not supported by the evidence or that its recom-

mendation is erroneous or unlawful. Except in the respects hereinafter noted, petitioner has failed to meet this burden.

Rule 2 of the Rules of Professional Conduct provides, in part: "A member of the State Bar shall not solicit professional employment by advertisement or otherwise." Rule 3 of the Rules of Professional Conduct provides, in part: "A member of the State Bar shall not employ another to solicit or obtain . . . professional employment for him . . . ." (West's Bus. & Prof. Code, foll. § 6076 [Deering's, Rules of Professional Conduct, rules 2, 3].)

As hereinabove pointed out, findings were made by both the local administrative committee and the disciplinary board that in the Jenkins, Stancil, and Jukich matters petitioner had solicited through cappers and that in the Jukich matter he had also solicited personally. In spite of petitioner's arguments to the contrary, the record sustains these findings by convincing proof and to a reasonable certainty, except with respect to the finding of solicitation through a capper in the Jukich matter.

Petitioner strenuously urges that evidence of the statements by the alleged cappers is hearsay evidence and hence is inadmissible and cannot be used for the purpose of showing that such persons were acting on his behalf. He says that it is essential that there be independent evidence to establish an agency relationship between the alleged cappers and himself and that such evidence is lacking.

██ State Bar disciplinary proceedings are governed exclusively by the Rules of Procedure of the State Bar of California (West's Bus. & Prof. Code, foll. § 6087 [Deering's, Rules of Procedure, rule 29]; *Schullman* v. *State Bar* (1973) 10 Cal.3d 526, 536, fn. 4 [111 Cal.Rptr. 161, 516 P.2d 865]); rule 29 provides that "[i]n formal proceedings legal evidence only shall be received." This rule seemingly requires the application of the hearsay rule in State Bar proceedings. (See *In re Richardson* (1930) 209 Cal. 492, 499 [288 P. 669].)

The extent to which the hearsay rule is applicable to bar matters is uncertain, however, in light of *Werner* v. *State Bar* (1944) 24 Cal.2d 611, 615 [150 P.2d 892], in which this court stated: "It has been repeatedly held . . . that disbarment proceedings are not governed by the rules of procedure governing civil or criminal litigation. [Citations.] There is no legislative requirement, therefore, that the rules of evidence in the Code of Civil Procedure [now Evidence Code] be applied in disbarment proceed-

ings, although they are frequently invoked to insure a fair hearing." (See 1 Witkin, Cal. Procedure (2d ed. 1970) § 252, p. 260; 7 Cal.Jur.3d, § 108, p. 385.)

We need not resolve the question of whether hearsay evidence, inadmissible at a civil or criminal proceeding, may be considered in State Bar disciplinary proceedings, however, since the statements in issue were not offered to prove the truth of the matter stated and thus were not hearsay. (Witkin, Cal. Evidence (2d ed. 1966) § 455, p. 418.) ▆▆ There is sufficient circumstantial evidence to infer an agency relationship between petitioner and the alleged solicitor.

For instance, in the Jenkins matter the record shows that *within five minutes* after Conners left Evelyn's hospital room petitioner appeared with medical release forms, a form requesting a police report, and an attorney's retainer agreement form. There was testimony that Conners told Evelyn at the time he placed the call to petitioner's office that petitioner was at that time in his office, and the fact that, as shown by other evidence, petitioner actually was in his office and that he appeared within five minutes with the above mentioned forms is evidence from which it may be inferred that Conners' alleged solicitation was made with petitioner's knowledge and approval.

The testimony that prior to dialing petitioner's telephone number Conners had said that petitioner was in his office, it should be noted, was not hearsay evidence. This is so, because it was offered not to prove that petitioner was in his office at that time but, rather to prove Conners' knowledge that petitioner was there. Such knowledge, when considered with the evidence of petitioner's prompt appearance with the retainer and other forms, constitutes a basis for finding, as the local committee and the disciplinary board did, that Conners was acting as petitioner's agent.

In the Stancil matter, it will be recalled, although petitioner denied that he was ever in Mrs. Stancil's hospital room, there was evidence that he had been there with Winters on one of the latter's numerous visits; that petitioner himself sought at that time to assure Mrs. Stancil of the outstanding success he would achieve if she employed him; and that when Mrs. Stancil refused to sign his retainer agreement, petitioner angrily turned to Winters and complained that he thought Winters had it all arranged for her to retain petitioner. The evidence that after Winters had made several previous calls on Mrs. Stancil and solicited her on behalf of petitioner, the latter accompanied Winters to the hospital room and

urged her to retain him, and then made the above-mentioned statements to Winters, is sufficient to warrant an inference that Winters, in making the solicitation, was acting as petitioner's agent. As hereinabove indicated, Winters admittedly was an employee of petitioner's law firm.

With respect to the Jukich matter, the fact that the members of Joseph's family appeared at petitioner's office the day after the parents had signed an agreement retaining another attorney is support for the testimony of Joseph's sister that either petitioner or Winters had solicited them by telephone and urged them to come down to petitioner's office to discuss the matter even though an agreement had been made with another attorney to handle the case.

The evidence of petitioner's aggressive importuning of the family to employ him after they had indicated they intended to abide by the arrangement made by the parents to have Mr. Fisher handle the case, and his arguing at great length that Joseph's sister should be appointed guardian, rather than the parents, so that the retainer agreement signed by the parents would not be effective, is sufficient to warrant the finding that petitioner personally solicited them, in violation of rules 2 and 3 of the Rules of Professional Conduct.

There would appear to be a reasonable doubt, however, that petitioner solicited the Jukich family through a capper. The fact that Winters was present at the office during the conference between the Jukiches and petitioner and petitioner's partner would constitute evidence from which it could reasonably be inferred that if it was Winters who made the telephone call, he was acting as petitioner's agent in so doing. But, as hereinabove indicated, Joseph's sister testified that the caller had identified himself as either petitioner or Winters and that at the time of the events she knew which one the caller had said he was, but that at the time of the hearing she could no longer remember which one he had represented himself to be. Additionally, she testified: "Well, I don't know whether it was [petitioner] or whether it was the investigator Mr. Winters for sure now, I don't remember, but I believe it was [petitioner]." Under the circumstances, although the evidence sustains a finding of personal solicitation by petitioner as a result of his vigorous urging that he be employed, even though he well knew that the parents, who intended to seek appointment as Joseph's guardians, had already signed a retainer agreement with another attorney, the evidence is inconclusive that Winters solicited the Jukiches in petitioner's behalf. Accordingly, the finding that the allegations of count 12 are true (i.e., that one of petitioner's cappers, with petitioner's knowledge and approval, solicited Joseph's parents and sister as prospective

clients) must be set aside, as any reasonable doubts should be resolved in favor of petitioner. (*Himmel* v. *State Bar,* 4 Cal.3d 786, 793-794(3) [94 Cal.Rptr. 825, 484 P.2d 993].)

■ Petitioner himself, as hereinabove pointed out, denied the charges against him; and he contends that, as in *Werner* v. *State Bar,* 13 Cal.2d 666 [91 P.2d 881], we should order the proceeding dismissed. In *Werner,* although the petitioner had testified that he had had no knowledge of the alleged capper's activities, the Board of Governors found that he knew that the alleged capper was soliciting professional employment for him in cases involving personal injuries. This court ordered the proceeding dismissed. However, the local administrative committee had found that none of the charges against the petitioner were true, and we concluded that since the local administrative committee's finding had been based on personal contact with the petitioner and the other witnesses, such finding was entitled to our respectful consideration and caused us to hesitate from a mere reading of the printed record to arrive at a different conclusion. In the present matter, on the other hand, the local administrative committee found the charges to be true with respect to four counts; and petitioner's denials do not convince us that such findings, made by the local administrative committee and adopted by the disciplinary board, should be disregarded. (See *Best* v. *State Bar,* 57 Cal.2d 633, 635-637 [21 Cal.Rptr. 589, 371 P.2d 325]; *Higgins* v. *State Bar,* 46 Cal.2d 241, 245-246 [293 P.2d 455]; *McCue* v. *State Bar,* 4 Cal.2d 79, 80-81 [47 P.2d 268].)

■ There would, however, appear to be merit to petitioner's contention that the disciplinary board acted improperly in finding that a common plan, scheme, and modus operandi for petitioner's cappers to solicit clients for him was established by three counts as to which no finding was made as to the truth of the allegations, as well as the four counts wherein it found the allegations to be true. A finding that the allegations of the additional three counts were true would be necessary to support the finding just referred to, and this court is hesitant to make such a finding on the basis of the printed record when the local administrative committee specifically found that the allegations were not true. (See *Barreiro* v. *State Bar,* 2 Cal.3d 912, 923(2) [88 Cal.Rptr. 192, 471 P.2d 992]; *Werner* v. *State Bar, supra,* 13 Cal.2d 666, 676-677.) Since the disciplinary board's action in increasing the recommended discipline to suspension for nine months was based on its added finding with respect to the existence of a common plan, scheme, and modus operandi, it is concluded that the discipline to be imposed should be suspension for six months, as recommended by the local administrative committee. ■ The fact that we have determined that there is reasonable doubt that the charges in count 12 have

been proved does not warrant a further lessening of the recommended discipline, in view of the fact that petitioner was proved to have *personally* solicited the prospective clients, as charged in count 13.

It is ordered that petitioner be suspended from the practice of law for a period of six months. This order is effective 30 days after the filing of this opinion.

Petitioner's application for a rehearing was denied August 12. 1974.