[No. S004556. Feb. 21, 1989.]

DANIEL JAMES CONWAY, Petitioner, v.
THE STATE BAR OF CALIFORNIA, Respondent.

COUNSEL

Arthur L. Margolis for Petitioner.

Diane C. Yu, Truitt A. Richey, Jr., and William Davis for Respondent.

OPINION

ARGUELLES, J.—Petitioner Daniel James Conway, admitted to the practice of law in this state in 1979, was involuntarily enrolled as an inactive

member of the bar in January 1988 on the ground that his conduct posed a substantial threat of harm to his clients and the public within the meaning of Business and Professions Code section 6007, subdivision (c). We issued a writ of review to consider his contentions that the procedures for such involuntary inactive enrollment denied him due process and that the State Bar's order was not warranted in his case. Finding no error, we sustain the order enrolling petitioner as an inactive member of the State Bar of California.

FACTS

Business and Professions Code section 6007, subdivision (c), first enacted in 1985 (Stats. 1985, ch. 453, § 2, p. 1747), authorizes the Board of Governors of the State Bar to order the involuntary enrollment on inactive status of an attorney whose conduct poses a substantial threat of harm to the attorney's clients or to the public.[1] The statute was adopted to address public concern over the ability of an attorney accused of professional misconduct to continue to practice law and thus potentially cause further harm to additional clients before disciplinary proceedings could be completed. (See Sen. Com. on the Judiciary, Staff Analysis of Assem. Bill No. 1275 (1985-1986 Reg. Sess.) § 3, p. 5.) An inactive member of the State Bar, of course, is not entitled to practice law (§ 6006), and the involuntary enrollment of an attorney on inactive status thus operates as a temporary suspension from the practice of law.

In the present case, petitioner was involuntarily enrolled as an inactive member as a result of conduct apparently attributable to a severe cocaine addiction that began in late 1983 and allegedly reached a peak in 1985 and 1986. No formal disciplinary charges had been brought against petitioner at

---

[1] Although the statute has since been amended in certain respects, which we will touch on in the course of this opinion, at the time of petitioner's case, it provided, in pertinent part: "(1) The board may order the involuntary inactive enrollment of an attorney upon a finding that the attorney's conduct poses a substantial threat of harm to the attorney's clients or to the public . . . .

"(2) In order to find that the attorney's conduct poses a substantial threat of harm to the attorney's clients or the public, each of the following factors shall be found, based on all the available evidence, including affidavits: (A) The attorney has caused or is causing substantial harm to the attorney's clients or the public.

"(B) There is a reasonable likelihood that the harm will reoccur or continue.

"(C) The balance of interests, as between the attorney on the one hand and the attorney's clients and the public on the other hand, favors an involuntary inactive enrollment.

"(3) The board shall formulate and adopt rules of procedure to implement this subdivision.

"In the case of an enrollment pursuant to this subdivision, the board shall terminate the involuntary inactive enrollment upon proof that the attorney's conduct no longer poses a substantial threat of harm to the attorney's clients or the public . . . ."

All further statutory references are to the Business and Professions Code unless otherwise indicated.

the time the involuntary enrollment proceedings were initiated by the State Bar, but 11 matters involving client complaints were pending at the investigation stage and complaints had been filed in another 7 matters.[2] Petitioner conceded that his addiction had undermined his personal life and professional career, but contended that he posed no present threat to his clients or the public because he had ceased using the drug. For reasons we will discuss subsequently, the referee presiding over the involuntary enrollment matter was not persuaded.

The referee noted that petitioner admitted several of the allegations against him—including allegations he violated sections 6068 [duties as an attorney] and 6106 [commission of act of moral turpitude, dishonesty, or corruption], as well as rules 2-111 [withdrawal from employment] and 5-101 [avoiding adverse interests] of the Rules of Professional Conduct—and found nine specific instances of misconduct involving eight different clients to be established by the evidence. Based on the evidence of misconduct and other factors, including the high recidivism rate for cocaine addicts and petitioner's failure to recognize the continuing harm he was even then causing his clients, the referee made the findings required by section 6007, subdivision (c): that petitioner's conduct had caused substantial harm to his clients and the public; that there was a reasonable likelihood the harm would continue or reoccur; and that the balance of interests between petitioner on the one hand and his clients and the public on the other strongly favored an involuntary inactive enrollment. The referee even suggested that such an order might be. "the only way" to prevent petitioner from causing further serious harm.

By order filed January 8, 1988, effective January 21, 1988, petitioner was involuntarily enrolled as an inactive member of the State Bar. We denied his request for a stay, but subsequently issued a writ of review in accordance with section 6083, subdivision (b), and California Rules of Court, rule 952(c), to consider his broad constitutional and specific fact-based challenges to the order.

---

[2] "The purpose of an investigation is to determine whether there is reasonable cause to believe that a member of the State Bar has violated a provision of the State Bar Act or the Rules of Professional Conduct." (Rules Proc. of State Bar, rule 502.) Following the initial investigation of a complaint, a matter may be terminated without action or a notice to show cause may issue to commence a formal disciplinary proceeding. (Rules Proc. of State Bar, rules 508-510, 550.) We are advised that a notice to show cause on seven counts of misconduct issued against petitioner after the involuntary enrollment order involved here. Although the record does not fully reflect the relationship of those counts to the allegations of the present proceeding, we take note of the subsequent developments to the extent they bear on our consideration of petitioner's due process concerns.

All further rule references are to the Rules of Procedure of the State Bar, unless otherwise indicated.

Discussion

■ We note at the outset that petitioner plainly has a property interest in the right to practice his profession that cannot be taken from him without due process. (*Barry* v. *Barchi* (1979) 443 U.S. 55, 64 [61 L.Ed.2d 365, 375, 99 S.Ct. 2642]; *Civil Service Assn.* v. *City and County of San Francisco* (1978) 22 Cal.3d 552, 560 [150 Cal.Rptr. 129, 586 P.2d 162]; see also *Giddens* v. *State Bar* (1981) 28 Cal.3d 730, 735 [170 Cal.Rptr. 812, 621 P.2d 851].) That, of course, is merely the beginning of our inquiry here.

■ "Once it is determined that due process applies, the question remains what process is due. . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands." (*Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593].) Here again, we start with substantial agreement. "[T]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" (*Mathews* v. *Eldridge* (1976) 424 U.S. 319, 333 [47 L.Ed.2d 18, 32, 96 S.Ct. 893], quoting *Armstrong* v. *Manzo* (1965) 380 U.S. 545, 552 [14 L.Ed.2d 62, 66, 85 S.Ct. 1187].) Our prior decisions and those of the United States Supreme Court identify the factors to which we look in determining what specific procedural safeguards are dictated by due process in a given situation: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (*Mathews* v. *Eldridge, supra,* 424 U.S. at p. 335 [47 L.Ed.2d at p. 33]; see also *People* v. *Ramirez* (1979) 25 Cal.3d 260, 269 [158 Cal.Rptr. 316, 599 P.2d 622]; *Civil Service Assn.* v. *City and County of San Francisco, supra,* 22 Cal.3d at p. 561.)

As this is the first time we have been called upon to consider the validity of the procedures for involuntarily enrolling an active member of the State Bar as an inactive member under section 6007, subdivision (c), we begin with a description of what those procedures actually entail. Thereafter, we turn to the question whether they comport with the principles of due process set forth above.

*Procedures for the Involuntary Transfer of an Active Member of the State Bar to Inactive Status*

Section 6007, subdivision (c)(3) directed the Board of Governors of the State Bar to formulate and adopt procedural rules to implement the statuto-

ry authorization for involuntarily enrolling attorneys meeting the criteria specified in the statute as inactive members of the State Bar. In rules 789 through 798, effective January 1, 1986, the board did so, and those rules thus help to define the parameters of the controversy before us.

The rules first specify generally that such involuntary enrollment proceedings are to be public and they are to be expedited. (Rule 789.) This initial provision thus reflects the statutory goal of preventing harm attributable to the time required for disciplinary proceedings, and the concern with the pace of proceedings is apparent throughout the rules.

The proceeding is commenced by the filing of an application for involuntary inactive enrollment by the Office of Trial Counsel with the Office of the Clerk of the State Bar Court. (Rule 791.) The application must be verified and must set forth "with particularity" the facts allegedly showing that the attorney's conduct meets the statutory criteria for involuntary inactive enrollment; i.e., that the attorney's conduct poses a substantial threat of harm to the attorney's clients or to the public. (*Ibid.*)

The application must be "promptly" submitted to a single referee appointed by the Presiding Referee of the State Bar Court in accordance with rule 790 and a hearing date set for the matter. (Rule 791.) A copy of the application and all supporting documents must be served by certified mail upon the attorney at the last registered address reflected in the membership records of the State Bar. (*Ibid.*) Notice of the scheduled hearing date must be given at the same time. (*Ibid.*) The rules do not explicitly indicate what the hearing date should be, but as they direct the hearing to be held "at the expiration of the [time for the attorney's response]" (rule 793) and as the proceeding is to be expedited (rule 789), the necessary implication is that the matter be set for hearing on the first available date after expiration of the response time.[3] The hearing may be continued once for good cause, but not for more than 10 days. (Rule 795.)

The attorney has 10 days from service of the application, extended in accordance with the provisions of section 6002.1, subdivision (c) for service by certified mail, in which to file a verified response. (Rule 792.) The right to a hearing is waived and none will be held if the attorney does not respond or include with the response a "request that the hearing which has been set pursuant to rule 791 be held" (*ibid.*), unless the Office of Trial Counsel

---

[3] In the present case, for example, the application was served by certified mail on December 4, 1987. Petitioner had until Saturday, December 19, to respond. (See § 6002.1, subd. (c); State Bar Court Rules, rule 1102(d).) The hearing was set for the following Monday, December 21, 1987.

makes a timely request for hearing (rule 793(b)) or the referee independently determines that a hearing should be held (rule 793(c)).

The decision of the referee on the application is to be filed and served no later than five days after the hearing or, if no hearing is held, five days after the date set for hearing. (Rule 794.) If the referee determines that the application should be granted, notice of the order is provided to the attorney and to this court in accordance with section 6081 (rule 797), and the attorney has 60 days in which to petition for review of the order (§ 6083, subd. (b); Cal. Rules of Court, rule 952(c)).

Absent from these provisions are any specific directives on the conduct of the proceedings. Rule 796 instead provides: "In proceedings conducted under this chapter [15, commencing with rule 789 and concluding with rule 799 on petitions for retransfer to active status], rules 1-314, 351-414 and 501-534 of these rules shall apply as nearly as may be practicable. All other rules shall be inapplicable to proceedings conducted under this chapter." Among the rules thus incorporated are the provisions for the issuance of subpoenas (rules 310 through 314), but rendered inapplicable are the other provisions regarding discovery in formal disciplinary proceedings (rules 315 through 324). And, as suggested by the statutory dictate that the decision on the application be "based on all the available evidence, including affidavits" (§ 6007, subd. (c)), rule 556, which provides for the rules of evidence and hence the hearsay rule to be "generally followed" in formal proceedings, is among those not incorporated and thus inapplicable here. We will consider further the import of these rules in the course of addressing petitioner's contentions.

*Do the Procedures for the Involuntary Transfer of an Active Member of the State Bar to Inactive Status Violate Principles of Due Process?*

▇▇▇ Petitioner challenges the above-described procedures on a variety of related grounds. He complains that the speed with which the hearing is held deprives a charged attorney of a fair opportunity to prepare a defense, that the rules provide no standards for the admissibility of evidence and fail to preserve the right to confront and cross-examine witnesses, that the hearing is prejudicial to the conduct of any subsequent formal disciplinary proceedings, that the rules vest inordinate power in a single hearing referee, and that there is no guaranty of a prompt final disposition of disciplinary charges if the attorney is transferred to inactive status. He thus challenges the procedures both on their face and as applied, and in essence asserts, in the customary terminology, that neither the predeprivation hearing nor the postdeprivation procedures are adequate to satisfy the requirements of due process. We cannot agree.

### 1. *Adequacy of Notice*

We find no merit to petitioner's contention that the rules do not offer a charged attorney a fair opportunity to prepare and present a defense. As indicated above, the rules require at least 10 days' notice of the scheduled hearing date (rules 791-793), and a continuance of an additional 10 days is available under rule 795 upon a showing of good cause. A showing that the necessary preparation for the hearing could not be completed within the initial 10-day period would no doubt constitute good cause (see State Bar Court Rules, rule 1131(d)), and we find it difficult to conceive that an adequate defense could not be mounted in the period of time provided by the rules.[4]

Moreover, we find it significant that an attorney faced with an application for involuntary inactive enrollment under section 6007, subdivision (c) has far greater rights than petitioner posits or seems to have attempted to employ. Petitioner asserts that the State Bar has the advantage of the power of subpoena to obtain records and that the charged attorney does not. He is wrong. Rules 310 through 314, pertaining to the issuance of subpoenas, explicitly apply to such proceedings. (Rule 796.)

Petitioner suggests that the rules nonetheless fail to guarantee the right secured by section 6085 "to the issuance of subpoenas for attendance of witnesses to appear and testify or produce books and papers . . . ." In this too he is wrong, for section 6086.5 explicitly confirms the authority of the referee in a proceeding under section 6007, subdivision (c) to exercise the power under section 6049, subdivision (a)(3) to "[c]ompel, by subpoena, the attendance of witnesses and the production of books, papers, and documents pertaining to the proceeding."

Petitioner finally asserts that the time limitations of proceedings under section 6007, subdivision (c) "make the right to subpoena witnesses, in many cases, impracticable and the right to subpoena documents legally impossible." Petitioner offers no explanation for these assertions—which are, in addition, inexplicably inconsistent with his assertion elsewhere that such rights do not exist in these proceedings—and, in any event, we see no

---

[4] As petitioner requested only a single continuance of one day, we need not decide in this case whether the referee to whom such a matter was assigned for hearing could grant additional time if a showing were made that only in that way could the attorney have adequate opportunity to meet the charges. Petitioner concedes that in March 1986—over a year and a half before the present proceeding was initiated—he began receiving letters from the State Bar informing him of client complaints against him and requesting him to explain. The application for involuntary inactive enrollment was thus not his first notice of the charges against him, and we see no basis on the facts of this case for him to complain that he did not have adequate opportunity to marshal evidence in support of his case and prepare his defense.

indication that it was either impracticable or legally impossible to invoke the rights here.

■ Petitioner also contrasts the rules for involuntary inactive enrollment under section 6007, subdivision (c), with those for the inactive enrollment under section 6007, subdivision (b) of attorneys who, because of mental infirmity or illness or the habitual use of intoxicants or drugs, are unable to perform their duties competently or are unable to practice law without danger to the interests of their clients or the public. Attorneys facing involuntary inactive enrollment under this other statutory provision have greater time to prepare and are entitled to the full range of formal discovery devices specified in rules 310-324. (Rule 643.) Petitioner contends there is no justification for denying these same opportunities to attorneys in proceedings under subdivision (c) of section 6007. Again, we cannot agree.

First, the two subdivisions address quite different problems. In both cases, the underlying goal, of course, is the protection of the public. But proceedings under section 6007, subdivision (b), are aimed at preventing the risk that because of certain specified conditions the attorney may not be able to perform competently or to practice law without some risk of danger to clients or the public. Under subdivision (c), however, the attorney must be found to have already caused, or be causing, substantial harm, and there must be a reasonable threat such harm will recur or continue. The possibility such an attorney's conduct will endanger his clients or the public is thus far greater than is the case with an attorney falling under the provisions of section 6007, subdivision (b), who may not yet have caused any appreciable harm. We cannot equate the two types of proceedings, and see no lack of justification for the different procedures. Although greater discovery rights and additional preparation time might serve the interests of the charged attorney, the value of such measures in avoiding an erroneous decision at the temporary suspension stage seems marginal at best and the additional time required would significantly increase the risk of the very harm the statute was meant to forestall.

### 2. *Admissibility of Evidence and Examination of Witnesses*

Again contrasting proceedings under subdivision (b) of section 6007 with those under subdivision (c), petitioner next objects that the rules governing the latter offer no standards for the admissibility of evidence, that unsubstantiated hearsay is allowed to be the basis of the referee's decision, and that confrontation and cross-examination of adverse witnesses is not allowed. Our prior observations on the distinct and different purposes of the two types of proceedings apply with equal force here to rebut petitioner's implicit contention that there is no rational basis for the different

procedures. Nor do we see any denial of due process in the subdivision (c) procedures themselves.

 There is no inherent problem with the use of hearsay in bar disciplinary matters. (See *Younger* v. *State Bar* (1974) 12 Cal.3d 274, 285 [113 Cal.Rptr. 829, 522 P.2d 5]; *Werner* v. *State Bar* (1944) 24 Cal.2d 611, 615 [150 P.2d 892].) The reliability of hearsay may vary widely, and even uncorroborated hearsay, without more, may suffice to support an agency decision, provided that such is permitted by statute. (*Walker* v. *San Gabriel* (1942) 20 Cal.2d 879, 881 [129 P.2d 349, 142 A.L.R. 1383].) The command of section 6007, subdivision (c)(2), that the referee's decision be "based on all the available evidence, including affidavits" we take to be such statutory authorization. And here the referee determined that the hearsay admitted possessed sufficient indicia of reliability that a reasonable person would deem the statements trustworthy. The interest in a prompt decision served by the use of affidavits and hearsay evidence outweighs whatever increase in accuracy of decision might result from a ban on such evidence.

Petitioner's separate contention that a charged attorney is entitled to confront and cross-examine the witnesses upon whose statements the State Bar relies in seeking the attorney's involuntary enrollment on inactive status also fails. Although the right of confrontation may be an essential element of due process before a person can be *permanently* excluded from the practice of law (see, e.g., *Willner* v. *Committee on Character* (1963) 373 U.S. 96, 103-104 [10 L.Ed.2d 224, 229-230, 83 S.Ct. 1175, 2 A.L.R.3d 1254]), the hearing that precedes a *temporary* deprivation of the right to pursue a particular profession need not offer that same opportunity (see, e.g., *Brock* v. *Roadway Express, Inc.* (1987) 481 U.S. 252, 266 [95 L.Ed.2d 239, 253, 107 S.Ct. 1740, 1749-1750]; *Cleveland Board of Education* v. *Loudermill* (1985) 470 U.S. 532, 545-546 [84 L.Ed.2d 494, 506, 105 S.Ct. 1487]). The right of confrontation is not a necessary component of due process in the present context.

Moreover, we would note that section 6085 provides, without any explicit exceptions, that "[a]ny person complained against shall . . . have a reasonable opportunity and right: [¶] (a) To defend against the charge by the introduction of evidence. [¶] (b) To be represented by counsel. [¶] (c) To examine and cross-examine witnesses." We see no indication that this general provision, applicable on its face to all attorney disciplinary proceedings, was not meant to apply to proceedings under section 6007, subdivision (c) as well. Indeed, section 6086.5, as noted previously, expressly indicates that the referee presiding over an involuntary inactive enrollment proceeding has the power under section 6049 to "[c]ompel, by subpoena, the atten-

dance of witnesses and the production of books, papers, and documents pertaining to the proceeding."

We need not here decide the consequences of a denial of the right to cross-examine witnesses, as we see no indication that petitioner attempted to exercise the right to confront and cross-examine witnesses or that it would have served the purposes of the hearing. We cannot find a due process violation in the failure to do what petitioner did not ask be done, particularly where no showing is made that a denial of the request, had one been made, would have been improper.[5]

### 3. *Prejudice in Subsequent Proceedings*

Petitioner also contends, albeit briefly and without citation of any authority, that the speed with which the involuntary inactive enrollment proceeding is completed creates a likelihood of prejudice to the attorney's defense in any subsequent disciplinary proceeding. He does not specify how this prejudice might arise, but simply contends in conclusory fashion that this manner of proceeding fails to comport with due process.

We disagree. Any subsequent disciplinary proceedings are just that—subsequent, and separate, proceedings. Neither the involuntary inactive enrollment order itself nor any of the findings made in those proceedings is binding or has any probative value in the formal disciplinary case.[6] The rules are different, as the attorney is entitled to the full range of discovery procedures and has greater opportunity to prepare a substantive defense to the charges; the hearing panel is different; and any final disciplinary order is subject to review not only by the Review Department of the State Bar Court but by this court as well before it takes effect. We can see no potential for prejudice.

---

[5] The right of the charged attorney to a "reasonable opportunity" to confront and examine witnesses, and the referee's power to compel the attendance of witnesses at the hearing, must be understood in context, of course, and neither is necessarily unlimited. If credibility of witnesses is not material to the issues or if allowing cross-examination would impede the significant interest in a prompt resolution of the matter without significantly advancing the goal of an accurate decision, then due process would not compel the referee to allow an attorney's request for a subpoena.

[6] We note that the most recent amendments to the statute include a new subdivision (c)(2)(C), which requires that, before ordering the involuntary inactive enrollment of an attorney, the hearing referee find that "[t]here is a reasonable probability that the State Bar will prevail on the merits of the underlying disciplinary matter." (Stats. 1988, ch. 1159, § 1 [No. 4 Deering's Adv. Legis. Service, p. 4134].) Even under this provision, the subsequent formal disciplinary proceedings remain unaffected by an earlier involuntary inactive enrollment order, for a new decision must be made under the procedures applicable at that stage. There is no greater prejudice here—and, indeed, there is far less potential for any prejudice—than when entry of a final decree is considered after a prior award of interlocutory injunctive relief.

### 4. *Hearing Before a Single Referee*

Petitioner next takes issue with the use of a single referee to preside over the hearing and decide the application, asserting—yet again with reference to proceedings under subdivision (b) of section 6007—that there is no justification for proceeding in this fashion, for depriving the charged attorney of an appeal to the Review Department of the State Bar Court, or for allowing the involuntary inactive enrollment order to take effect prior to our review. ██ ██ ██ As before, we find no merit to this comparison or to the other aspects of petitioner's argument.[7] It suffices to note that while petitioner may have a right to a hearing before he is prevented from practicing law, he has no right to a particular forum or particular procedures, provided only that the matter is heard by an impartial arbiter under procedures that comport with due process.

### 5. *Prompt Final Disposition of Disciplinary Charges*

██ Having considered petitioner's contentions in roughly chronological order, we come to what is seemingly his most significant argument: that even if the procedures for placing him involuntarily on inactive status do not violate due process to that point, the failure to guarantee a prompt final disposition of the charges is such a violation and taints the entire proceedings.

In so arguing, petitioner relies mainly on the decision of the United States District Court for the Eastern District of Pennsylvania in *Gershenfeld* v. *Justices of the Supreme Court of Pa.* (E.D.Pa. 1986) 641 F.Supp. 1419. That decision held unconstitutional the procedures for the temporary suspension

---

[7]The dissent suggests that section 6007, subdivision (c) should be ruled unconstitutional as an invalid delegation of judicial power by the Legislature. The dissent is exceedingly generous in crediting petitioner with having "raise[d] and brief[ed] this issue" (dis. opn., p. 1127, fn. 3), for petitioner based his challenges on statute, but we will not rest our rejection of the constitutional argument on that basis. The authorities relied upon by the dissent simply hold that the power to take final disciplinary action belongs to this court. (See, e.g., *Hustedt* v. *Workers Comp. Appeal Bd.* (1981) 30 Cal.3d 329, 339 [178 Cal.Rptr. 801, 636 P.2d 1139]; *Brotsky* v. *State Bar* (1962) 57 Cal.2d 287, 300-301 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310]; *In re Shattuck* (1929) 208 Cal. 6, 12 [279 P. 998].) While these decisions suggest, quite strongly in places, that legislation empowering the State Bar to impose final discipline upon an attorney would be unconstitutional, they do not stand for the proposition that an order of the State Bar cannot be allowed to take effect before we have reviewed it. Contrary to the dissent's suggestion, in our view the statutory authorization for the State Bar to order involuntary inactive enrollment in exigent circumstances, subject to our immediate and plenary review, cannot reasonably be said to "defeat or materially impair" the inherent perogatives of this court. (See *Brydonjack* v. *State Bar* (1929) 208 Cal. 439, 444 [281 P. 1018, 66 A.L.R. 1507].) And we would note that in this case petitioner could even have sought our review before the involuntary inactive enrollment order took effect.

of Pennsylvania attorneys because the rules specified no time for making a final decision. But petitioner overlooks a significant point: under the Pennsylvania rules, unlike those we consider here, there was no requirement of a hearing before the attorney could be temporarily suspended from the practice of law. In those circumstances, it is plain that a prompt postdeprivation hearing was constitutionally mandated. (*Barry* v. *Barchi, supra,* 443 U.S. at p. 66 [61 L.Ed.2d at p. 377].) Quite simply, ours is a different case, for the rules provide for a predeprivation hearing, and one we have held satisfies the requirements of due process at that stage.

Given that the procedures governing hearings under section 6007, subdivision (c) plainly reduce the time the attorney has to meet the charges against him, however, and give him fewer rights than are enjoyed by attorneys facing adverse action under other statutes, we are persuaded that a final disposition is required at some point to validate the procedures governing the predeprivation hearing. (See *Matter of Kenney* (1987) 399 Mass. 431 [504 N.E.2d 652, 656].) Indeed, the Legislature, in its most recent amendments to section 6007, subdivision (c) has made it clear that it contemplates just such a further proceeding, calling for expedited treatment of the underlying disciplinary matter if the attorney is placed on inactive status. (New § 6007, subd. (c)(3), added by Stats. 1988, ch. 1159, § 1 [No. 4 Deering's Adv. Legis. Service, p. 4134].)

The State Bar has not yet promulgated rules of procedure to implement this new provision, and we do not believe it wise or appropriate for us to establish any fixed constitutional limits at this juncture. The United States Supreme Court has similarly declined to draw any fixed constitutional boundaries in addressing comparable issues, but its decisions do much to refute petitioner's contention that the time for completing formal disciplinary proceedings in this state—estimated by him to exceed one year—is unconstitutionally protracted as a matter of law.

In *Cleveland Board of Education* v. *Loudermill, supra,* 470 U.S. at page 547 [84 L.Ed.2d at page 507], the Supreme Court held that a delay of nine months between a temporary suspension and a final adjudication was not unconstitutional per se—and so held in the context of presuspension procedures that offered the charged party a simple opportunity to respond that was far short of a full contested evidentiary hearing, such as is contemplated by the rules implementing section 6007, subdivision (c). A fortiori, the potential for a delay of similar magnitude here cannot be deemed unconstitutional on its face.

Most recently, in *Federal Deposit Insurance Corporation* v. *Mallen* (1988) 486 U.S. 230 [100 L.Ed.2d 265, 108 S.Ct. 1780], the Supreme Court

confirmed that the significance of a postsuspension delay cannot be determined in a vacuum, but must be evaluated under the same due process standards applicable to other aspects of a challenged procedure. And those standards do not support petitioner's challenge here. Although petitioner plainly has an interest in a prompt decision, he also has an interest, shared by the State Bar and the public, in a *correct* one. (*Id.* at p. __ [100 L.Ed.2d at pp. 278-279, 108 S.Ct. at p. 1788].)

We need not here attempt to determine when delay in the final disposition of the underlying disciplinary charges would amount to a denial of due process, although we would question whether a time span of more than one year from inception to the decision of the review department could be countenanced in any circumstances.[8] We trust the State Bar will take note of the guidance provided by *Loudermill, supra,* 470 U.S. 532, and similar decisions in formulating rules of procedure to implement the legislative mandate to expedite resolution of the underlying charges in these cases.[9]

The question remains as to what effect the absence of any current regulation should have in the present case. Petitioner argues that because the State Bar had established no definite time limit for the conduct of the formal disciplinary proceedings, the order placing him involuntarily on inactive status was unconstitutional and must be set aside. We cannot agree this is the appropriate remedy. As we have seen, the procedures followed by the State Bar at the involuntary inactive enrollment stage fully satisfied predeprivation constitutional requirements. Insofar as petitioner's complaint relates to the State Bar's failure to hold a reasonably prompt, final adjudicative hearing, his remedy is to seek such a hearing and to request that his involuntary enrollment on inactive status be vacated in the event of unconstitutionally improper delay.

---

[8] We note that an attorney placed on inactive status has the right to petition at any time for reinstatement to active status, and we think it significant that it is the charged attorney who has the ability to determine when to move for reinstatement, for the short time limits for responding previously imposed upon the attorney then apply to the State Bar. (Rule 799.) If the attorney believes that information developed in the course of the formal disciplinary proceedings shows that "the attorney's conduct no longer poses a substantial threat of harm to the attorney's clients or the public" (§ 6007, subd. (c)), there is no need to await a final disposition of the charges before seeking to terminate the involuntary enrollment order. The availability of this option does not obviate the need for a final disposition of the disciplinary charges at some point, but it must be taken into account in determining when that final determination must be made.

[9] Such rules should, at a mimimum, specify the time within which a notice to show cause must issue on the underlying disciplinary charges if that step has not been taken prior to the issuance of an order for the attorney's involuntary inactive enrollment, and should specify strict deadlines for the other stages of the formal disciplinary proceedings—not mere recommended guidelines (cf. State Bar Court Rules, rule 1130(b))—that could not be exceeded without the consent of the charged attorney.

In this case, petitioner, of course, sought review (see *ante,* p. 1112, fn. 2.) immediately after the involuntary inactive enrollment order was issued, at a time when it was not clear if and when formal disciplinary proceedings would be instituted. The State Bar has advised us that the trial in the formal disciplinary proceeding was originally set to commence on October 11, 1988—less than nine months after the order for petitioner's involuntary enrollment on inactive status took effect (cf. *Cleveland Board of Education* v. *Loudermill, supra,* 470 U.S. at p. 547 [84 L.Ed.2d at p. 507])—and was continued to January 1989 at *petitioner's* insistence. In these circumstances, we cannot conclude that petitioner was denied due process.

■ We thus find no denial of due process in the rules governing proceedings for the involuntary inactive enrollment of attorneys under the provisions of section 6007, subdivision (c), either on their face or as applied in this case. In each instance, the additional measures petitioner would have us require would serve the interest in avoiding an erroneous decision only slightly, if at all, and would frustrate the significant interest of the State Bar and the public in averting the threat of substantial harm. There remains for our consideration only petitioner's contention that the order in his case was not supported by the evidence.

*Did the Evidence Establish That Petitioner Presented a Substantial Threat of Harm to His Clients or the Public?*

■ The statutes do not specify what standard we should employ in reviewing an order of involuntary inactive enrollment, and we have not previously had occasion to address this question. As our review of such orders is provided for in the same statute that permits review of the more familiar orders recommending the suspension or disbarment of attorneys (§ 6083, subds. (a), (b)) and as that statute specifies without distinguishing between the two types of orders that "[u]pon such review the burden is upon the petitioner to show wherein the decision or action is erroneous or unlawful" (§ 6083, subd. (c)), we think it appropriate here to invoke the same standard of review. That is, although we will independently review the evidence and exercise our independent judgment on the propriety of the order, we will view the findings of the referee with great deference. (See, e.g., *Kelly* v. *State Bar* (1988) 45 Cal.3d 649, 655 [247 Cal.Rptr. 608, 754 P.2d 1104].)

■ As noted previously, the referee found nine specific instances of misconduct involving eight different clients to be established by the evidence, including petitioner's own testimony. We have not previously in this opinion described the scope of petitioner's misconduct that is reflected in those findings. We do so now.

(1) Petitioner was retained by Mr. and Mrs. B. to handle a personal injury case. He settled their claims in February 1987 for over $15,000, depositing the settlement funds into his own account and using them for his own benefit. Mr. and Mrs. B. were not paid their funds.

(2) Petitioner settled a personal injury claim for Mr. D. in August 1985. Petitioner deposited the $3,000 settlement check in his own account and used the funds. Mr. D. was not paid his funds.

(3) Petitioner also represented Mr. D. in a contract dispute. Petitioner was given $5,000 to be used to make installment payments to creditors. He misappropriated the funds and did not repay Mr. D., claiming as he did with respect to the settlement check that Mr. D. owed him attorney fees.

(4) Petitioner accepted $200 from Mr. G. to review a contract. He did not do so. Mr. G. sued petitioner in small claims court and won. Petitioner appealed to superior court and lost. He did not pay the judgment.

(5) Mr. L. hired petitioner in a quiet title action. Mr. L. and petitioner got into a fee dispute after a settlement was reached, and petitioner refused to do any further work or to surrender any of the file to Mr. L. or new counsel until a court order was obtained.

(6) Petitioner represented Mrs. M. in a dissolution proceeding. He was directed by the court to prepare a judgment. He did not do so. He was directed to pay opposing counsel $1,430 in sanctions. He did not do so. He was then ordered to pay an additional $1,139 in sanctions, and the court declared petitioner's conduct to be willful.

(7) Petitioner represented Mr. R. in a personal injury case that was settled in 1985 but failed to pay the $1,405 lien held by Mr. R.'s physician. He paid less than half of the small claims court judgment ultimately obtained by the doctor.

(8) Petitioner was hired by Ms. S. to write a letter to a contractor. He did not do so, and did not pay the $522 small claims court judgment against him obtained by Ms. S.

(9) Mrs. W. hired petitioner to handle a personal injury case. He allegedly settled the case without authority, depositing the $2,500 settlement check in his own account and using the funds for his own benefit. Mrs. W. was not paid her funds.

These findings, supported by clear and convincing evidence, established good cause to believe petitioner guilty of numerous instances of misconduct

and violations of the Rules of Professional Conduct. Petitioner admits as much. Petitioner asserts, however, that his past misconduct was due to his drug addiction, that he was candid in admitting his misconduct, and that his unrebutted evidence of rehabilitation revealed he did not pose a substantial threat of harm to his clients or the public within the meaning of section 6007, subdivision (c). As did the referee, we accept the first assertion, question the second and cannot agree with the third.

Respondent testified at the hearing that his misconduct was due to his admitted cocaine addiction, but asserted that he had been under treatment since February 1987, that he had ceased using cocaine at that time—except for a few "slips"—and that he had ceased using the drug entirely as of July 1987. As further evidence of his new drug-free lifestyle, petitioner pointed to a renewed relationship with his fiancee—who had left him once because of his cocaine usage and testified she would not remain with him if he used drugs—and to his employment of a legal secretary of high ethical character—who testified he would not tolerate any departures from proper conduct and would leave petitioner's employ if petitioner resumed his drug use. Petitioner thus argued he was no longer a threat to his clients, asserting that his addiction was under control and that his financial commitments had been reduced by, among other things, a relocation of his practice to a more moderately priced location.

As the referee observed, however, petitioner's misappropriation of the funds belonging to Mr. and Mrs. B. occurred subsequent to February 1987, a time when petitioner was allegedly under treatment, and the last "slip" into cocaine usage he acknowledged at the hearing was in July 1987, only a few months earlier. That petitioner might not have used cocaine since that time was a record of dubious value in view of his prior lapses after abandoning use of the drug for a few months, as well as the high recidivism rate for cocaine addicts testified to by petitioner's own doctor. Even the testimony of petitioner's fiancee and secretary failed to offer much support for petitioner's assertion, given that his fiancee testified that what petitioner called his "few slips" had been on the order of once every two weeks or so and that his secretary had at the time of the hearing been in petitioner's employ for less than three months.

The referee also noted that petitioner did not entirely appreciate the gravity of his misconduct or his duties as a member of the bar. He ignored all State Bar requests for information and for explanations of the basis for client complaints until faced with the application for involuntary inactive enrollment. In fact, he apparently did not reveal to anyone, not even a fellow attorney serving as his advisor and confidant, the scope of his troubles until that application was filed. At the hearing, he continued to assert

that his misappropriation of funds from Mr. D. was "in essence" a negotiated settlement of a fee dispute with the client—an assertion for which there was no support in the record and with which petitioner conceded the client would not agree. He placed the blame for the failure to pay the medical lien of Mr. R.'s doctor upon his former partner, despite the existence of a small claims judgment, which remained unpaid, against petitioner personally. Most tellingly, petitioner pointed to the relocation of his practice as evidence of an attempt to rehabilitate himself and as demonstrating that he had reduced his financial commitments and was no longer a threat to his clients, but his own testimony revealed he had financed that very move with the funds misappropriated from Mr. and Mrs. B.

In view of petitioner's past lapses and history of recurring wrongs, we cannot conclude the referee erred in finding petitioner's professed rehabilitation unreliable and insufficient to overcome the strong showing that petitioner posed a substantial threat of harm to his clients and the public. The statutory criteria were established by convincing proof to a reasonable certainty (see *Coppock* v. *State Bar* (1988) 44 Cal.3d 665, 677 [244 Cal.Rptr. 462, 749 P.2d 1317]), and petitioner was properly placed on inactive status as a result.

## CONCLUSION

We conclude that the procedures for the involuntary inactive enrollment of attorneys under section 6007, subdivision (c) satisfy the requirements of due process and that petitioner has not met his burden of proving he should not have been placed on inactive status. We therefore sustain the State Bar's order enrolling petitioner Daniel James Conway as an inactive member of the State Bar of California.

Lucas, C. J., Broussard, J., Panelli, J., and Eagleson, J., concurred.

**KAUFMAN, J.**—I dissent.

The majority concludes that the procedures for the involuntary inactive enrollment of attorneys under Business and Professions Code section 6007, subdivision (c)[1] satisfy the requirements of due process. However, I would hold that the statute, which permits the *State Bar* to order the involuntary inactive enrollment of an attorney, constitutes an invalid delegation of judicial power by the Legislature in violation of article VI, section 1 and article

---

[1] All further statutory references are to the Business and Professions Code unless otherwise noted.

III, section 3 of the California Constitution.[2] I would also hold that by failing to guarantee a reasonably prompt commencement of the disciplinary charges underlying the order of involuntary inactive enrollment, the statute violates due process. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) Finally, I would hold that on the facts of this case the State Bar's proceeding against petitioner under subdivision (c) of section 6007 rather than subdivision (b), with its greater procedural protections, violated the State Bar's obligation to afford petitioner equal protection of law. The reasons which impel me to these conclusions are set forth below.

## DISCUSSION

### A. *The Power to Discipline Attorneys Resides in the Courts Alone and May Not Be Delegated by the Legislature to the State Bar*[3]

Because attorneys form an "integral and indispensable unit in our system of administering justice," it is well settled that the profession and practice of the law constitutes a unique public trust. (*State Bar of California v. Superior Court* (1929) 207 Cal. 323, 330 [278 P. 432].) Accordingly, "the membership, character and conduct of those entering and engaging in the legal profession have long been regarded as the proper subject of legislative regulation and control . . . ." (*Id.* at p. 331; accord *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 337 [178 Cal.Rptr. 801, 636 P.2d 1139].) At the same time, historically and constitutionally the admission, discipline and disbarment of attorneys have long been recognized as among the inherent powers of the *courts alone.* (*Hustedt v. Workers' Comp. Appeals Bd., supra,* 30 Cal.3d at pp. 336-337; *Brotsky v. State Bar* (1962) 57 Cal.2d 287, 300-301 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310]; *Brydonjack v. State Bar* (1929) 208 Cal. 439, 443 [281 P. 1018, 66 A.L.R. 1507].) " 'An attorney is an officer of the court and whether a person shall be admitted [or disciplined] is a judicial, and not a legislative, question.' " (*Hustedt v. Workers' Comp. Appeals Bd., supra,* 30 Cal.3d at p. 337, quoting *In re Lavine* (1935) 2 Cal.2d 324, 328 [41 P.2d 161].)

Recognizing that the regulation of the legal profession "comprehends the existence of *common* boundaries between the legislative, judicial, and executive zones of power" (*Hustedt v. Workers' Comp. Appeals Bd., supra,* 30

---

[2] Article VI, section 1 provides: "The judicial power of this State is vested in the Supreme Court, courts of appeal, superior courts, municipal courts, and justice courts. All except justice courts are courts of record."

Article III, section 3 provides: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

[3] Contrary to the suggestion in the majority opinion (maj. opn. at p. 1120, fn. 7), petitioner clearly raised the constitutional separation-of-power issue in his brief as well as at oral argument.

Cal.3d at p. 338, italics added), this court, in a series of early decisions which affirmed the constitutionality of the State Bar Act (act) (§ 6000 et seq.) in the face of a separation of powers challenge, set forth the basic test for assessing whether the Legislature has overstepped its oversight authority: "[T]he legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions." (*Brydonjack* v. *State Bar, supra,* 208 Cal. at p. 444; accord *In re Lavine, supra,* 2 Cal.2d at p. 328; *Hustedt* v. *Workers Comp. Appeals Bd., supra,* 30 Cal.3d at p. 338.) Applying this standard, we upheld without exception the legislative delegation of authority to the State Bar (bar) to certify a candidate for admission, and to recommend the suspension or disbarment of a member for misconduct. (See *In re Shattuck* (1929) 208 Cal. 6, 12 [279 P. 998]; *Brydonjack* v. *State Bar, supra,* 208 Cal. at pp. 444-445.)

Critical to these early determinations of constitutionality, however, was the fact that under the act, "[*f*]*inal* [*disciplinary*] *action can only be taken by this court.*" (*Hustedt* v. *Workers Comp. Appeals Bd., supra,* 30 Cal.3d at p. 339, quoting *Brotsky* v. *State Bar, supra,* 57 Cal.2d at pp. 300-301, original italics.) As we explained in *In re Shattuck*: "[T]he only order or orders which are provided for [in the State Bar Act], and which have or were intended to have the effect of working the disbarment, suspension or discipline of any person . . . *are the final orders which are to be made by this court* under the provisions of said act, and . . . any decision which the Board of Bar Governors may be empowered or minded to make . . . is merely recommendatory in character and has *no other or further finality in effecting the disbarment, suspension or discipline of those persons who may be brought before said board* . . . ." (208 Cal. at p. 12, italics added.)

Nor, as we explained in a companion case to *Shattuck,* does the act purport to delegate the inherent *judicial* authority *to admit* persons to the practice of law. "The making of orders of admission is . . . clearly a judicial act of this court." (*Brydonjack* v. *State Bar, supra,* 208 Cal. at p. 445; §§ 6060, 6066.)

Among its various functions under the act, the bar is statutorily authorized to "examine all applicants for admission to practice law" and thereafter "[t]o certify to the Supreme Court for admission those applicants who fulfill the requirements . . . ." (§ 6046, subds. (a), (c).) In addition, the bar may investigate complaints about the conduct of attorneys, conduct disciplinary hearings, and thereafter "recommend to the Supreme Court the disbarment or suspension from practice of members . . . ." (§§ 6043, subds. (a), (c) and 6078.) The act further provides that upon any decision recommending the disbarment or suspension from practice of a member,

the bar shall immediately file a copy of its decision, together with the transcript and findings, with the clerk of this court. (§ 6081.) The member may then, of course, file a petition for review to modify or reverse the decision recommending the disbarment or suspension. (§§ 6082, 6083.) When no petition for review has been filed, this court "shall make such order as *it* may deem proper in the circumstances." (§ 6084, italics added.) Thus, even where a member fails to seek review, no discipline is imposed except upon order of this court, which retains its inherent authority to reverse or modify the bar's recommendation. (See *In re Jones* (1971) 5 Cal.3d 390, 394 [96 Cal.Rptr. 448, 487 P.2d 1016].)

As we explained recently in *Saleeby* v. *State Bar* (1985) 39 Cal.3d 547 [216 Cal.Rptr. 367, 702 P.2d 525], in these two areas, the admission and discipline of attorneys, "the bar's role has consistently been articulated as that of an administrative assistant to or adjunct of this court, which nonetheless *retains its inherent judicial authority to disbar or suspend attorneys.* [Citations.] In the area of admission to practice, an applicant is admitted *only by order of the Supreme Court* which, upon certification by the bar's examining committee . . . 'may admit such applicant as an attorney at law in all the courts of this State . . . .' (Bus & Prof. Code, § 6064.)" (*Id.* at p. 557, italics added.)

Thus, even as we have upheld the admission and disciplinary provisions of the act against constitutional challenge, we have consistently warned that the legislative prerogative is limited. The key to a proper balance lies in the locus of decisionmaking authority. As we observed in *Brotsky* v. *State Bar, supra,* 57 Cal.2d 287, had the Legislature attempted to vest disciplinary authority in the bar, the constitutionality of the act would have been very much in doubt: "In disciplinary matters (and in many of its other functions) [the State Bar] proceeds as an arm of this court. If the Legislature had not recognized this fact, and made provision therefor, the constitutionality of those portions of the State Bar Act which provide for the admission, discipline and disbarment of attorneys *could have been seriously challenged on the ground of legislative infringement on the judicial prerogative. Historically, the courts, alone, have controlled admission, discipline and disbarment of persons entitled to practice before them* [citations]." (*Id.* at p. 300, italics added.)[4]

Happily, however, the Legislature (until recently) has respected these fundamental separation-of-power principles. In the Board of Governors it

---

[4] The majority errs in concluding that our decisions permit the bar to impose a *temporary* disciplinary suspension, so long as such discipline is not "final" and is subject to "review." (Maj. opn. at p. 1120, fn. 7.) The issue is *power,* not timing. The cases unequivocally hold that only the courts may impose a disciplinary suspension or disbarment.

created an effective body to advise and make recommendations to the courts in matters of admission, discipline and disbarment; it did *not* attempt to delegate fundamental judicial prerogatives to the bar. (*Brotsky* v. *State Bar, supra,* 57 Cal.2d at pp. 300-301.)

Unhappily, the same cannot be said for the recent legislative augmentation of the act—section 6007, subdivision (c)—which is at issue in this case. As originally enacted in 1968, section 6007 was confined to circumstances in which either (1) a member had been involuntarily committed as a "dangerous person" (Welf. & Inst. Code, § 5300 et seq.) or as a "mentally disordered sex offender" (Welf. & Inst. Code, § 6250 et seq.); had been ordered to receive treatment for narcotics addiction (Welf. & Inst. Code, §§ 3051, 3106.5, 3152); had been judged to be insane under the Penal Code, or had been placed under the care of a guardian or conservator (§ 6007, subd. (a)); or (2) a member of the bar, because of mental infirmity or addiction to intoxicants or drugs, was unable to practice competently or to practice without danger to his clients and the public. (§ 6007, subd. (b).)

As to attorneys falling within the first category, section 6007, subdivision (a) provides that the board of governors shall reinstate the member when his restoration to capacity has been judicially determined, or upon the member's release from confinement. As to attorneys falling within the second category, the statute provides that the board shall terminate the inactive enrollment upon proof that the member's disability no longer exists. (§ 6007, subd. (b).)

Although the validity of the foregoing provisions has never been tested, and is not at issue here, it is at least arguable that both subdivisions would pass constitutional muster. Both condition involuntary inactive enrollment upon proof of *disability,* rather than incompetence or misconduct. Indeed, as originally enacted section 6007 was not in any real sense a *disciplinary* statute. Involuntary enrollment under subdivision (a) requires no independent evaluation of professional competence or ethics, but is premised solely upon a prior judicial determination of mental incapacity. Subdivision (b), which does require independent proof that an attorney has failed competently to perform his duties, is nevertheless limited to those cases in which the source of the attorney's troubles is mental infirmity, illness or drug addiction. Reinstatement is not premised upon a showing of moral or ethical rehabilitation, but rather is *mandatory* upon proof that the *disability* no longer exists.

Permitting the temporary suspension of a member upon a judicial order of mental incompetence, or upon proof—after notice and a full hearing—of mental disability, constitutes a reasonable and measured exercise of legisla-

tive oversight of the legal profession. Neither determination is principally concerned with attorney misconduct, ethics or discipline. Accordingly, neither provision can reasonably be said to "defeat or materially impair" any inherent prerogative of the judiciary. (*Brydonjack* v. *State Bar, supra,* 208 Cal. at p. 444; *Hustedt* v. *Workers' Comp. Appeals Bd., supra,* 30 Cal.3d at p. 338.)

The same cannot be said for subdivision (c) of section 6007. Adopted by the Legislature in 1985 (Stats. 1985, ch. 453, § 2) and subsequently amended in 1986 (Stats. 1986, ch. 1114, § 1), this section permits the bar to order the involuntary inactive enrollment of an attorney "upon a finding that the attorney's conduct poses a substantial threat of harm to the attorney's clients or to the public . . . ." (§ 6007, subd. (c)(1).) In order to make such a finding, the statute requires that the bar find (1) that the attorney has caused or is causing substantial harm to the attorney's clients or the public, (2) that there is a reasonable likelihood the harm will reoccur or continue, and (3) that the balance of interests favors an involuntary inactive enrollment. (§ 6007, subd. (c)(2)(A), (B), and (C).) The bar is further empowered to terminate the involuntary enrollment upon proof that the attorney's conduct no longer poses a substantial threat of harm to the attorney's clients or to the public. (§ 6007, subd. (c)(3).)[5]

Apart from the significant procedural differences (to be discussed below), the substantive features of an involuntary enrollment proceeding under section 6007, subdivision (c) do not appear to differ significantly from a conventional disciplinary proceeding. Petitioner herein, for example, was found to be culpable of misconduct in eight separate client matters. In four he was found to have improperly commingled and misappropriated funds from settlements which he made on behalf of his clients, in the other four he

---

[5] Although not here applicable, recent legislative amendments to section 6007 (Stats. 1988, ch. 1159, § 1) modified the prerequisites set forth in subdivision (c)(2) to read as follows: "In order to find that the attorney's conduct poses a substantial threat of harm to the interests of the attorney's clients or the public pursuant to this subdivision, each of the following factors shall be found, based on all the available evidence, including affidavits: (A) The attorney has caused or is causing substantial harm to the attorney's clients or the public.

"(B) The attorney's clients or the public are likely to suffer greater injury from the denial of the involuntary inactive enrollment than the attorney is likely to suffer if it is granted, or there is a reasonable likelihood that the harm will reoccur or continue. Where the evidence establishes a pattern of behavior, including acts likely to cause substantial harm, the burden of proof shall shift to the attorney to show that there is no reasonable likelihood that the harm will reoccur or continue.

"(C) There is a reasonable probability that the State Bar will prevail on the merits of the underlying disciplinary matter."

The 1988 legislative amendments also added subsection (3) to subdivision (c), which provides as follows: "In the case of an enrollment under this subdivision, the underlying matter shall proceed on an expedited basis."

was found to have failed to perform services for which he had been retained, and failed to return unearned fees. As the bar candidly states in its brief, the hearing referee in this matter "found that petitioner had demonstrated a pattern of repeatedly violating his oath and duties as an attorney, including his *fiduciary and ethical obligations to his clients.*" (Italics added.) For all intents and purposes, therefore, the involuntary inactive enrollment hearing was a mini-disciplinary proceeding; the procedures differed, but the subject matter and the findings relating to petitioner's professional misconduct were essentially identical to those of a routine disciplinary proceeding.

The ramifications of the referee's decision in this matter were markedly different from the referee's decision in a disciplinary proceeding, however. Having found that petitioner's habitual misconduct constituted a substantial threat to his client's interests and to the public, the referee ordered that petitioner be placed on inactive enrollment.[6] That suspension will continue in effect until the bar, upon an application for reenrollment, reverses its decision; until completion of formal disciplinary proceedings; or until this court, under its inherent authority, orders that it be lifted.

It is plain that the proceedings of the bar in this matter cannot withstand constitutional scrutiny. As noted earlier, only the courts may suspend an attorney for disciplinary purposes. (*Saleeby* v. *State Bar, supra,* 39 Cal.3d at p. 557; *Hustedt* v. *Workers' Comp. Appeals Bd., supra,* 30 Cal.3d at pp. 336-337, 339; *Brotsky* v. *State Bar, supra,* 57 Cal.2d at pp. 300-301; *In re Shattuck, supra,* 209 Cal. at p. 12.) The Legislature may delegate to the bar, as an administrative arm of the courts, the authority to investigate and to make recommendations in such matters; it may not, however, delegate the inherent judicial prerogative to discipline by means of disbarment or suspension. (*Hustedt* v. *Workers Comp. Appeals Bd., supra,* 30 Cal.3d at p. 339; *Brotsky* v. *State Bar, supra,* 57 Cal.2d at pp. 300-301.) Though styled an "inactive enrollment," the effect of the referee's order is clearly that of a "temporary" disciplinary suspension. Hence, the provisions of section 6007, subdivision (c) which permit the bar to order the involuntary inactive enrollment of an attorney are patently unconstitutional.

Of course, it could be argued that invalidating section 6007, subdivision (c) on the ground that it constitutes an unconstitutional delegation of judicial authority is simply not worth the candle. The infringement may be only "temporary" (the attorney is always free to seek a court-ordered stay), while the purported governmental interest in removing incompetent attor-

---

[6] The hearing officer apparently stayed his order of involuntary enrollment for 14 days to allow petitioner to seek a stay from this court. Otherwise, the order would have taken effect immediately. There is no requirement or provision in section 6007, subdivision (c) for a stay pending review and a final dispositional order of this court.

neys as expeditiously as possible is certainly substantial. This argument, however, fails for several reasons. First, it embraces the principle that the end justifies the means, an inherently dangerous concept. If the principle of exclusive *judicial* authority is sacrificed here, what is there to prevent a future delegation to the bar of much more extensive authority, say to admit or to actually disbar a member? The principle is identical. If we surrender the power to discipline here, we undermine any principled basis to retain it in the future.

The argument to ignore the constitutional infringement is even less persuasive when one considers that adequate procedures *already* exist to accomplish the legislative objective of removing dangerously incompetent or unethical attorneys as expeditiously as possible. This court has the inherent authority to suspend an attorney, after notice and an opportunity to be heard, pending review of a disciplinary recommendation. (See *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 230 [113 Cal.Rptr. 175, 520 P.2d 991]; *In re Hallinan* (1954) 43 Cal.2d 243, 253-254 [272 P.2d 768].) Moreover, if removal is required before the completion of disciplinary proceedings, there is no reason why the bar may not proceed pursuant to the expedited procedures of section 6007, subdivision (c). However, instead of issuing an order of involuntary inactive enrollment, the bar could file a *recommendation* with this court that an attorney be placed on inactive status pending completion of the underlying disciplinary proceeding, and request an expedited review and disposition of the matter.

We are not the only state which has perceived the need for a procedure to expedite the suspension of an attorney upon a showing that he poses a substantial threat to his clients or the public. Pursuant to this court's request, the bar has provided us with copies of statutes or rules from 10 different states relating to temporary suspension from practice. Each provides, without exception, that when it appears an attorney poses an immediate threat to his clients, the public, or the effective administration of justice, *the supreme court* of that state may order his immediate suspension pending the completion of full disciplinary proceedings. (See 7A Colo.Rev.Stat. (1987 cum. supp.) Court Rules, rule 241.8; Fla. Rules of Court (1987) rule 3-5.1(g); Me. Rules of Court (1988) rule 7(e); 7 Mass., Supreme Jud. Court Rules, rule 4.01, § 12A; Minn. Rules of Court (1988) rule 16; Nev.Rev.Stats. (1980) rule 102, subd. 4; N.J., Rules Governing the Courts of N.J. (1988 supp.) rule 1:20-4(g); Pa. Rules of Disciplinary Enforcement (1986) rule 208(f); Wash. Court Rules (1988) rule 3.2; Wis. Court Rules and Proc. (1987) rule SCR 22.30.)

The State of Wisconsin's rules for the interim suspension of attorneys are typical in this regard. The Wisconsin rules state: "(1) The supreme court,

on its own motion or otherwise, may temporarily suspend an attorney's license to practice law in Wisconsin where it appears that the attorney's continued practice of law during the pendency of a disciplinary proceeding poses a threat to the interests of the public and the administration of justice. [¶] (2) Before entering an order temporarily suspending an attorney's license, the court shall issue an order requiring the attorney to show cause why his or her license to practice law should not be temporarily suspended." (Wis. Court Rules and Proc. (1987) rule SCR 22.30.)

Other states have thus managed to adopt procedures for the expeditious removal of incompetent or unethical attorneys from practice, without having to sacrifice judicial control of attorney discipline. We in California certainly could effect a similar accommodation. Indeed, as noted earlier, the procedures are already at hand.

In advising this court on matters of attorney admission, discipline and disbarment, the bar performs a critical and thankless task. Unnecessary impediments should not be placed in its path. The imposition of attorney discipline, however, is the sole and exclusive prerogative of *the judiciary*. In my view, it should remain so. I would hold, therefore, that the provisions of section 6007, subdivision (c), which in effect permit the bar to discipline a member by means of an order that he be placed on involuntary inactive enrollment, are unconstitutional.

B. *The Failure to Require a Prompt Disciplinary Hearing Constitutes a Violation of Due Process*

Even assuming, arguendo, that the bar could constitutionally impose a temporary suspension pursuant to section 6007, subdivision (c), the absence of a statutory requirement that the bar also provide, within a *reasonably prompt* period of time, a full and final determination of the underlying disciplinary matter, renders the statute constitutionally suspect on its face.

Indeed, the majority opinion concedes, in light of the "reduce[d]" time an attorney has to meet the charges against him and the fact that he enjoys "fewer rights" than attorneys facing adverse action under other statutes, "that a final disposition is required *at some point* to validate the procedures governing the predeprivation hearing."[7] (Maj. opn. at p. 1121, italics add-

---

[7]In view of the need for swift action when an attorney constitutes a substantial threat, I agree with the majority that a member may be afforded "fewer rights" at this stage, particularly in terms of a shorter notice period. However, this makes it all the more imperative that a full and final disciplinary hearing be commenced promptly thereafter. I do not agree, however, that the need for an expeditious hearing and decision requires that a member be deprived of his right to confront and cross-examine witnesses. Even the temporary suspension

ed.) In my view, however, such an amorphous time requirement is totally inadequate to protect the interests of a member placed on involuntary inactive enrollment pursuant to the expedited procedures of section 6007, subdivision (c).

"At some point" in time is cold comfort to an attorney whose practice is quietly disintegrating while the bar fiddles. I do not question the bar's good faith in such matters. It is apparent, however, that "at some point" provides absolutely no time limit and precious little incentive to the bar to proceed expeditiously with the underlying disciplinary matter. Why should they? The attorney has *already* been placed on indefinite suspension.

The instant matter provides a case in point. At the time of the involuntary enrollment proceeding against petitioner, no formal disciplinary charges had been filed, although investigations into eleven matters were underway and client complaints in another seven had been filed. After the order placing petitioner on involuntary inactive enrollment became effective on January 21, 1988, the bar delayed until April 11, 1988, an additional three months, to issue an order to show cause. Moreover, the charges in the order to show cause *excluded* two of the eight matters which formed the basis of petitioner's involuntary inactive enrollment. To our knowledge, formal charges in these two matters have still not been filed, more than *ten months* after the effective date of the bar's order of involuntary inactive enrollment.

The United States Supreme Court has recognized that due process imposes restraints on the *timing* as well as the form of a postdeprivation hearing. The due process constraints will depend, in each case, "on appropriate accommodation of the competing interests involved." (*Goss* v. *Lopez* (1975) 419 U.S. 565, 579 [42 L.Ed.2d 725, 737, 95 S.Ct. 729]; see also *Cleveland Board of Education* v. *Loudermill* (1985) 470 U.S. 532, 557 [84 L.Ed.2d 494, 513-514, 105 S.Ct. 1487] [conc. and dis. opn. of Brennan, J.].) The relevant interests have been recognized as threefold: the importance of the private interest and the length or finality of the deprivation, the magnitude of the governmental interest, and the nature of the procedure used. (*Mathews* v. *Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 96 S.Ct. 893]; *Goss* v. *Lopez, supra,* 419 U.S. at p. 579 [42 L.Ed.2d at pp. 737-738].)

Weighing these factors, I cannot agree with the majority that due process is satisfied so long as the bar provides a final disposition "at some point." It is undisputed that petitioner has a substantial property interest in his license

---

of such a fundamental interest as the right to earn a living requires that these basic due process protections be made available. Any delay occasioned thereby is more than offset by the enhanced reliability such rights lend to the fact-finding process.

to practice law. (*In re Ruffalo* (1968) 390 U.S. 544, 550 [20 L.Ed.2d 117, 122, 88 S.Ct. 1222].) The disruptions caused by the loss of one's license during the considerable period of time which may pass between the involuntary inactive enrollment and the commencement, much less completion, of final disciplinary proceedings may be truly devastating. Consider the impact on one's personal and professional life of these months in limbo: the loss of wages, indeed of the opportunity to earn a living; the exhaustion of savings or conversion of possessions to replace wages; the possibility that one could not pay for even basic needs, such as food, clothing and rental or mortgage payments.

The governmental interest in protecting the public from incompetent or unethical attorneys is substantial. However, that interest is adequately served once the attorney is placed on temporary suspension. Fairness compels that a reasonably prompt commencement of final disciplinary proceedings should immediately follow if it has not preceded the temporary suspension.

The Massachusetts Supreme Court reached a similar conclusion in the *Matter of Kenney* (1987) 399 Mass. 431 [504 N.E.2d. 652], a decision which the majority cites with approval. (Maj. opn. at p. 1121.) Following a preliminary hearing, an attorney was placed on temporary suspension pending a full disciplinary proceeding. The Massachusetts court determined, in agreement with the majority in the instant case, that "a temporary suspension [after a limited preliminary hearing] without a final adjudication would not be constitutional . . . ." (*Id.* at p. 656.) The court observed further that "[s]ince the rule does not specify *when* formal disciplinary proceedings must be instituted . . . we interpret the rule to require that disciplinary proceedings, if not already begun, *must be instituted within a reasonable time.*" (*Ibid.*, italics added.)

The Massachusetts court did not venture to suggest a specific time period within which a disciplinary proceeding, assuming that one has not already commenced, must be initiated. However, given the fact that in this state it is not unusual for a disciplinary hearing to commence six months or more after the issuance of a notice to show cause, I would hold, at a minimum, that a notice to show cause on the underlying disciplinary matter must issue within 30 days after the effective date of an involuntary inactive enrollment under section 6007, subdivision (c). A similar 30-day requirement is contained in the rules governing temporary suspensions of attorneys in the State of Pennsylvania. (Pa. Rules of Disciplinary Enforcement (1986) rule

208(f)(5).)[8] There is no reason that the bar, having already conducted a preliminary investigation and hearing in connection with the involuntary enrollment, cannot issue formal charges and commence final disciplinary proceedings within this time period.

The majority's reliance on *Cleveland Board of Education* v. *Loudermill, supra,* 470 U.S. 532, for the proposition that a delay of even nine months is not unconstitutional, is misplaced. In that case, the court held merely that Loudermill "failed to allege facts sufficient to state a cause of action, and not that nine months can never exceed constitutional limits." (*Id.* at p. 554 [84 L.Ed.2d at p. 512] [conc. and dis. opn. of Brennan, J.].) Nor does *Loudermill* suggest that affording the petitioner a *pre*deprivation hearing discharges the bar's responsibility to move with dispatch thereafter. On the contrary, the court reaffirmed the need to balance the respective interests at stake in determining the timing and form of the *post*deprivation hearing necessary to satisfy the requirements of due process. (470 U.S. at pp. 542-543 [84 L.Ed.2d at p. 504].)

Absent the requirement of a reasonably prompt postdeprivation notice of formal disciplinary charges, I would hold that section 6007, subdivision (c) violates due process.[9]

## C. *Petitioner Was Denied Equal Protection of the Law*

Aside from the separation-of-power and due process infirmities apparent from the face of the statute, it is also clear that petitioner was denied equal protection of the law under section 6007, subdivision (c) as applied.

---

[8] The Pennsylvania rule provides: "A respondent-attorney who has been temporarily suspended pursuant to this rule shall have the right to request an accelerated disposition of the charges which form the basis for the temporary suspension by filing a notice with the Secretary of the Board and Disciplinary Counsel requesting accelerated disposition. Within 30 days after filing of such a notice, Disciplinary Counsel shall file a petition for discipline under subdivision (b) of the rule and the matter shall be assigned to a hearing committee for accelerated disposition. Thereafter the matter shall proceed and be concluded by the hearing committee, the Board and the Court without appreciable delay. If a petition for discipline is not timely filed under this paragraph, the order of temporary suspension shall be automatically dissolved, but without prejudice to any pending or further proceedings under this rule." (Pa. Rules of Disciplinary Enforcement (1986) rule 208(f)(5).)

[9] It should be noted, in this regard, that recently enacted amendments to section 6007, subdivision (c) include the provision that, "In the case of an enrollment under this subdivision, the underlying matter shall proceed on an expedited basis." (Stats. 1988, ch. 1159, § 1; see fn. 4, *ante.*) Unless it is construed in a manner consistent with the views expressed above, however, I would hold that the new provision fails to provide adequate due process protection, since it contains no express requirement that a notice to show cause must issue within any particular period of time, much less any reasonable period, after the order of involuntary inactive enrollment.

As the majority accurately observes, petitioner was placed on involuntary inactive enrollment as the result of misconduct "attributable to a severe cocaine addiction . . . ." (Maj. opn. at p. 1111.) Section 6007, subdivision *(b)* expressly provides that the bar may place a member on involuntary inactive enrollment if it finds, "[a]fter notice and opportunity to be heard . . . that the member, because of . . . the habitual use of intoxicants or drugs, is (i) unable or habitually fails to perform his or her duties or undertakings competently, or (ii) unable to practice law without substantial threat of harm to the interests of his or her clients or the public."

Petitioner appeared to satisfy the criteria of section 6007, subdivision (b) in every respect. Indeed, his was virtually a textbook case of an attorney disabled and unable to practice competently or safely "because of the habitual use of . . . drugs." Why, then, did the bar not proceed against petitioner under this subdivision? Although the record is silent, one answer is perfectly obvious. Unlike subdivision (c), with its hurry-up 10-day notice rule, constricted discovery and anything-goes rules of evidence, subdivision (b) proceedings are conducted in the normal fashion, with the usual procedural safeguards of notice, discovery and evidentiary rules in place.

Thus, under the statute as currently constituted, another attorney, identically situated to petitioner, identically addicted and disabled, and posing an identical risk of harm to the public, could nevertheless enjoy full due process protection *if the bar decided to seek an involuntary enrollment under subdivision (b) rather than (c)*. It is well settled that the state "cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment" (*Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232, 238-239 [1 L.Ed.2d 796, 801-802, 77 S.Ct. 752, 64 A.L.R.2d 288]), nor "arbitrarily foreclose to any person the right to pursue an otherwise lawful occupation." (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; accord *Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288, 293 [101 Cal.Rptr. 896, 496 P.2d 1264, 53 A.L.R.3d 1149].)

There is nothing in the statute or the record to justify the bar's disparate treatment of petitioner. " 'Action is arbitrary not only when it is capricious, but also if it lacks adequate support in the record, when the facts do not justify the conclusion.' " (*Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771, 786-787 [97 Cal.Rptr. 657, 489 P.2d 537], quoting *Hollon* v. *Pierce* (1967) 257 Cal.App.2d 468, 478 [64 Cal.Rptr. 808].) The record and the statute in question yield absolutely no rational basis for the bar's decision to proceed against petitioner under the provisions of subdivision (c) rather than the more directly applicable provisions of subdivision (b). The only

plausible reason for singling out petitioner was the fact that the bar was put to far less inconvenience under the relaxed notice, discovery and evidentiary rules of subdivision (c). That, in my estimation, does not constitute a legitimate basis of distinction.

The majority strains to find a valid distinction in the purposes underlying subdivisions (b) and (c). The former, it is alleged, is merely "aimed at preventing the *risk* that . . . the attorney *may* not be able to perform competently or . . . without . . . danger to clients or the public." (Maj. opn. at p. 1117, italics added.) Under subdivision (c), the attorney must be found "to have *already* caused . . . harm . . . and there must be a reasonable threat such harm will *recur or continue*." (Maj. opn. at p. 1117, italics added.) These alleged distinctions, however, are at odds with the plain language of the statute. Subdivision (b) expressly provides that the bar may not institute proceedings unless it finds "after preliminary *investigation* or during the course of a *disciplinary proceeding,* that probable cause exists therefor." It is reasonable to infer that such an "investigation" or "disciplinary proceeding" would be based on some prior misconduct. The bar must also find that the attorney is "unable or habitually fails" to perform his duties. Such a finding would be extremely improbable absent some tangible case or cases in which the attorney has already failed to perform his duties. Clearly, both subdivisions (b) and (c) contemplate proof of *prior* misconduct and harm to clients or the public.

Equally unpersuasive is the assertion that only subdivision (c) requires proof of *future* misconduct. What would be the point of seeking involuntary enrollment under *either* subdivision unless the misconduct and risk of harm were likely to recur or continue?

Though the majority purports to find "no lack of justification for the different procedures" under subdivisions (b) and (c) of section 6007 (maj. opn. at p. 1117), in point of fact the only justifications they offer are baseless. There was no legitimate reason to deny petitioner in this matter the full range of procedural protections otherwise accorded members of the bar under section 6007, subdivision (b). For this reason, I would hold that section 6007, subdivision (c) is invalid as applied.

Mosk, J., concurred.