*466 BROWN, J., Dissenting.
Reluctantly, even ambivalently, I dissent. They say hard cases make bad law; the result here, however, is foreordained: the majority reaches the only provident conclusion possible in the current circumstances. But it is also true that, underlying its reasoning and result, one has to wonder at the practical value of what this court does under the procedures now prevailing in bar discipline cases. As the court itself has acknowledged only recently, changes in our own rules made in the wake of legislative amendments to the administrative procedures governing bar discipline proceedings “relieve the court of the burden of intense scrutiny of all disciplinary recommendations.” (Cal. Supreme Ct., Invitation to Comment— Proposed Adoption of Rule 951.5, Cal. Rules of Court (Nov. 23, 1999) p. 2; see also Cal. Supreme Ct., Practices and Proc. (1997 rev.) pp. 3, 18-19, 25-26.) Moreover, the matrix of grantable issues identified in California Rules of Court, rule 954[1] appears to truncate the scope of our review. And in cases where no writ is sought, we usually content ourselves with less than that measure of “review.” Unless, by dint of skill or luck, the issues are framed so they are deemed to fall within the ambit of rule 954, an attorney facing suspension or disbarment from the right to practice her profession gets no hearing, no opportunity for oral argument, and no written statement of reasons—from this or any other article VI court. (Cal. Const., art. VI, § 14; hereafter article VI.) Instead, she gets a summary denial of review, the one-line order. Is that enough? Regrettably, it seems that, for now at least, it will have to do.
We should not, however, pretend the current legal order does not mark a transformation in the attorney discipline process, one in which a constitutional touchstone—meaningful judicial review by an article VI court—has been jettisoned. A decade ago, Justice Kaufman could trouble to write a vigorous dissent from an opinion of this court upholding summary administrative suspension of a lawyer under emergency circumstances. (Conway v. State Bar (1989) 47 Cal.3d 1107, 1126 [255 Cal.Rptr. 390, 767 P.2d 657, 80 A.L.R.4th 101].) That dissent continues to make persuasive reading today. Why? Because a like situation is presented here, following the 1988 legislative overhaul of the procedures governing attorney discipline. (Stats. 1988, ch. 1159, § 1, p. 3699.) Should we care? More to the point, can we afford to care? Ten years have passed, and the majority sings the same refrain, even if substantively things are not the same as they were when this court filed between 20 and 40 State Bar opinions a term. Under the new regime, attorneys penalized for professional misconduct get less in the way of genuine judicial review of discipline than licensed nonattomeys do. The reasons for this paradox lie in the convoluted history of the legal profession and its intimate relation to the courts, coupled with the extraordinary growth *467 in the number of lawyers admitted to practice in California over the past 30 years.
The contemporary anomaly is that that history has produced less in the way of judicial protection than our statutes give to, say, veterinarians and cosmetologists. Some of the circumstances that have contributed to that anomaly—the enormous growth of the legal profession in California and the consequent need for an elaborate disciplinary apparatus, for example—are matters lying beyond the control of this or any other court. Others, however —the threat posed by a growing legislative involvement in attorney discipline, the related bureaucratization of the disciplinary process—we conceivably might have mitigated. (See, e.g., Bus. & Prof. Code, § 6082 [jurisdiction to review attorney discipline lies in this court and the Court of Appeal].) As matters stand, and as the majority opinion attests," it is force of circumstance that obliges us to make- our peace with the new legal order. The majority goes about that task studiously, employing the archaic lexicon of a bygone day to describe the new and different contemporary reality.
That new reality—what a pessimist might describe as the untoward merger of two branches of government in the regulation of attorneys—is especially worrisome as a matter of state constitutional law. For that reason also, it transcends parochial issues of professional discipline. Unlike Congress, by the text of the federal Constitution the legislature of a sovereign of limited powers, state legislatures possess plenary lawmaking powers. That is why structural principles of republicanism common to both state and federal governments—the tripartite division into legislative, executive and judicial branches—assume even greater significance where state government is concerned. What petitioner really objects to is the absence of any indication that, despite the elaborate administrative hoops through which attorneys facing discipline must jump, a court of law, a constitutionally founded judicial body, has considered the lawyer’s claims on the merits before pronouncing judgment. It is not simply that judicial review ensures compliance with statutory commands. It does more, helping to sustain a complex of social values, maintaining a structural balance among the parts of government and, by its existence and vigorous exercise, protecting individual liberty.
What petitioner can legitimately ask from us is not procedural due process. Surely, the elaborate procedures provided attorneys subjected to the State Bar’s disciplinary apparatus are sufficient to satisfy that concern. (See generally Rules Proc. of State Bar.) His complaint goes to a different flaw altogether. It is founded on the rock of the constitutional right to meaningful judicial review of government acts intended to deprive someone of the *468 means of livelihood. Review by a constitutional court, review by real judges whose allegiance is to the judiciary, to its standards and ideals—to the rule, in short, of law. Review, moreover, that is seen, observed in the form of reasoned judicial opinions, and in the ritual of oral argument. In combination, these features make up hallowed ground, for they comprise a signal feature of our democracy—the protection of the individual from executive and legislative overreaching by neutral magistrates, magistrates whose decisions are constrained by objective principles of judicial reasoning and by precedent, and whose rulings are an open book. (See Bickel, The Morality of Consent (1975) p. 26 [“Confined'to a profession, the explication of [legal] principle is disciplined, imposing standards of analytical candor, rigor, and clarity.”].) Lacking, as Alexander Hamilton wrote, “either the sword or the purse,” the judiciary exists by virtue of “merely judgment.” (Hamilton, The Federalist No. 78 (Rossiter ed. 1961) p. 465; see also Scalia, The Rule of Law as a Law of Rules (1989) 56 U. Chi. L.Rev. 1175.) That is the essence of the judicial function; that is what is missing in this sui generis special proceeding over which we exercise an inherent authority. (See, maj. opn., ante, passim.)
Judicial judgment—reasoned decisions, rather than decisions with reasons —is the constitutional counter to the appetitive coordinate branches of government, implicit in the architecture of state as well as federal government. We expect, and justifiably so, a different discipline from a court than from a bureaucracy. And because the powers of state government are not textually limited, a close adherence to the principles of the separation of powers' becomes all the more critical to constitutional government. Courts must be especially vigilant, must vigorously resist encroachments that heighten the potential for arbitrary government action. The existence of the administrative state is a legislative admission of an inability to articulate general rules governing conduct. If legislative delegation enlarges the scope of administrative action, it enlarges the scope for arbitrariness as well. When the judiciary cedes its authority to a bureaucracy, when it permits the Legislature to determine the scope of judicial review, the potential for arbitrary government action rises exponentially.
Nothing so well illustrates the through-the-looking-glass quality of the majority’s reasoning as its rejection of petitioner’s claim that his case qualifies as a “cause” under article VI and must be decided “in writing with reasons stated.” The majority’s reasoning is fine, as far as it goes. It omits, however, an observation that ought to be decisive: this court is the only judicial body involved in the attorney discipline process. An attorney’s petition for review to this court marks the first and only time in the disciplinary process that article VI judges are asked to enter the case. For *469 that reason, and for that reason alone, our decision, even if it is a summary denial of review, necessarily decides a cause. The majority makes an able attempt to paper over this reality, but in doing so it is compelled to adopt an empty formalism.
The reality is that, as the legal cartel of the past disintegrates, as the demand for legal services continues to surge, the profession has lost its guild-like character and become more like other occupations. (Cf. Posner, Overcoming Law (1995) pp. 63-70; Kronman, The Lost Lawyer (1993) pp. 273-306.) This trend toward occupational homogeneity is reflected in the elaborate administrative apparatus for attorney discipline. But, and again paradoxically, dynamic professional growth has produced contradictions, contradictions that are not lost on attorneys who defend lawyers facing disciplinary charges. By letter brief, an organization of State Bar defense counsel—the Attorney Discipline Defense Counsel—points out that vocational licensees enjoy greater judicial rights than lawyers. And they are right. The host of practitioners of this and that trade, licensed and regulated by government agencies, has access to administrative mandamus in discipline cases, where judges of article VI courts review questions of law de novo and questions of fact under the substantial evidence standard. They get both a full plate of administrative due process and real judicial review. Before honest-to-God judges. (See Code Civ. Proc., § 1094.5.)
That is the way attorney discipline cases used to be decided, in the old days, before the 1988 amendments to the State Bar Act. True, one of the effects of the prior order was the obligation of this court to carry on its docket and decide—almost always after oral argument, always by written opinion—at least 20 State Bar disciplinary cases each term. The substantiality of that largely fact-intensive task cannot be gainsaid. But the principled answer to that difficulty, if difficulty it was, is not to fold the attorney discipline system into the ceaselessly expanding administrative state, with the remark that our summary denial of review qualifies as review on the merits because it’s . . . well, sui generis.
Alas, attorneys faced with the loss of their livelihoods must now make do with the State Bar Court—an entity performing judicial functions but, despite the competence of its members, exercising no judicial powers—and our summary denials, unless the petition can be said to satisfy the criteria of rule 954. Yet the majority continues to pay lip service to the old regime, even using the same words and citing the same cases to paste over a hollowing-out of meaningful judicial review. We have tinkered with our rules so that it appears nothing has changed. But these are only words; the reality is different. In point of practice, in bar disciplinary cases in which we *470 decline to grant review, we issue a pro forma order executing the State Bar Court’s “recommended” discipline. (See rule 954(a).) In those cases where review is not sought, it is questionable whether any judicial act of substance takes place. Oh, to be sure, our rules purport to alleviate these concerns. Rule 953, for example, provides for entry of orders by this court, even if ministerial, rather than adopting the legislative model that makes the State Bar Court’s recommendations self-executing. (Compare rule 953(b) with Bus. & Prof. Code, § 6084, subd. (a).) Still, we no longer make an individual decision on the imposition of discipline. And the situation is not much improved if review is sought and denied; the rule gives us no choice but to impose the recommended discipline. (Rule 954(b).)
At the heart of the majority opinion is the supposition that review by any other name is still review and passes constitutional muster; that due process is satisfied by any process, however much the decisionmakers may be driven by bureaucratic agendas or political ties. In this comer of the law, at least, we seeni to be presiding over a union of the legislative and judicial components of government. It may be efficient; it certainly isn’t pretty. And because it seems antithetical to the constitutional design, I dissent.

 Hereafter all rule references are to the California Rules of Court.